JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
CANDIS MITCHELL, Bar No. 242797
TAYLOR FATHERREE, Bar No. 358709
LISSET M. PINO, Bar No. 346133
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: taylor_fatherree@fd.org

Counsel for Geoffrey Giglio

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GEOFFREY GIGLIO,<br><br>Defendant. | **Case No.:** CR 25–264 VC<br><br>**DEFENDANT'S MOTION TO EXCLUDE EVIDENCE UNDER RULE 404(B)**<br><br>Pretrial Conf.: November 17, 2026<br><br>Trial: November 30, 2026 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii
INTRODUCTION ..... 1
LEGAL STANDARD ..... 1
STATEMENT OF FACTS. ..... 2
I. The government's 404(b) notice was deficient. ..... 3
II. The Court should exclude unnoticed 404(b) evidence. ..... 4
III. The Court should exclude messages Mr. Giglio sent to other public officials. ..... 5
A. Rule 404(b) applies because the messages are not inextricably intertwined with the offense. ..... 5
B. None of the messages are admissible under Rule 404(b). ..... 7
i. Statements to Benson ..... 7
ii. Statements to Gamble ..... 8
iii. Statements to Garcia ..... 9
iv. Statements to MVM. ..... 10
C. More prejudicial than probative ..... 10
IV. The Court should exclude evidence of Mr. Giglio's prior interactions with law enforcement. 11
V. The Court should exclude Mr. Giglio's alleged law enforcement admissions. . 12
A. Statement regarding Jasmine Crockett and Jamie Raskin ..... 13
B. Statements regarding Jack Auchincloss. ..... 14
C. Statements allegedly made on Parlor. ..... 15
D. Statement regarding killing federal agents. ..... 16
VI. The Court should exclude statements to FBI S.A. Ballantyne ..... 17
VII. The Court should exclude evidence of Mr. Giglio's firearms ownership ..... 18
VIII. The Court should exclude Messages to unknown recipients. ..... 20
IX. The Court should exclude evidence of Mr. Giglio's messages to family and recordings of family arguments ..... 22
X. The Court should exclude messages sent to others. ..... 24
XI. The Court should exclude unrelated firearm images, political searches, calendar entries, and legal materials found on Mr. Giglio's phone. ..... 27
A. The "inextricably intertwined" doctrine does not make the contents of a defendant's phone admissible as a unit. ..... 28

B. The firearm images do not establish threatening intent merely because they depict firearms. .......... 30

C. The screenshot of the seditious-conspiracy statute invites an unsupported inference of a separate, inflammatory criminal purpose. .......... 36

D. Searches for other political figures do not establish a common plan to threaten them. .......... 37

E. The firearm calendar entries do not establish preparation for charged communications years later. .......... 38

F. The political calendar entries must also be excluded. .......... 40

G. The debt-collection note does not establish an intention to harass a public official. .......... 41

H. Altogether, the aforementioned phone evidence must be excluded under Rule 403 .......... 42

CONCLUSION .......... 42

# TABLE OF AUTHORITIES

## Federal Cases


*Counterman v. Colorado*,
600 U.S. 66 (2023) ........ 6, 20

*Old Chief v. United States*,
519 U.S. 172 (1997) ........ 1, 10

*United States v. Alfonso*,
759 F.2d 728 (9th Cir. 1985) ........ 21, 21-22

*United States v. Arambula-Ruiz*,
987 F.2d 599 (9th Cir. 1993) ........ 1, 7

*United States v. Bagdasarian*,
652 F.3d 1113 (9th Cir. 2011) ........ 26

*United States v. Bailey*,
696 F.3d 794 (9th Cir. 2012) ........ 1, 7

*United States v. Carpenter*,
923 F.3d 1172 (9th Cir. 2019) ........ *passim*

*United States v. Charley*,
1 F.4th 637 (9th Cir. 2021) ........ 6

*United States v. Hegwood*,
977 F.2d 492 (9th Cir. 1992) ........ 21

*United States v. Hill*,
953 F.2d 452 (9th Cir. 1991) ........ 21

*United States v. Hodges*,
770 F.2d 1475 ........ 22

*United States v. Loftis*,
843 F.3d 1173 (9th Cir. 2016) ........ 6, 16, 17

*United States v. Mayans*,
17 F.3d 1174 (9th Cir. 1994) ........ 5

*United States v. Powell*,
587 F.2d 443 (9th Cir. 1978) ........ 8

*United States v. Sutcliffe*,
505 F.3d 944 (9th Cir. 2007) ........ 19, 20

*United States v. Vega*,
188 F.3d 1150 (9th Cir. 1999) ........ 4, 5

*United States v. Vizcarra-Martinez*,
66 F.3d 1006 (9th Cir. 1995) ........ *passim*

*United States v. Waters*,
627 F.3d 345 (9th Cir. 2010) ........ 27

*United States v. Yagi, No. CR-12-0483 EMC*,
2013 WL 10570994 (N.D. Cal. Oct. 17, 2013) ........ 12

*Virginia v. Black*,
538 U.S. 343 (2003) ........ 18

**Federal Rules and Statutes**

15 U.S.C. § 1692d ........ 41

18 USC § 2384 ........ 36

Fed. R. Evid. 403 ........ *passim*

Fed. R. Evid. 404 ........ *passim*

**Other Authorities**

Crim. L.R. 16 ........ 4, 5

## INTRODUCTION

Geoffrey Giglio, by and through his counsel, hereby moves to exclude evidence noticed by the government under Rule 404(b). *See* Dkt. 47; Judge Chhabria's Criminal Standing Order. This motion is based upon the attached memorandum of points and authorities, all files and records in this case, and any further evidence as may be adduced at the hearing on these motions. Mr. Giglio reserves the right to supplement this motion during the course of trial as needed.

The government seeks to introduce an enormous amount of impermissible propensity evidence that would unfairly prejudice Mr. Giglio, profoundly confuse the issues, and result in both a lengthy trial and an untold number of "mini-trials." This evidence should be excluded.

## LEGAL STANDARD

Under Federal Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). This rule codifies the longstanding principle that "[t]he state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime." *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (internal quotation marks and citation omitted). Other act evidence is admissible only to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Other acts evidence is admissible if: (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged. *See United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012) (citation omitted). The government "has the burden of proving that the evidence meets all of the above requirements." *United States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th Cir. 1993) (citation omitted).

Under Rule 404(b), the government is required to provide "reasonable notice of any [404(b)] evidence that it intends to offer at trial. Fed. R. Evid. 404(b)(3)(A). The Rule

specifically requires that the government "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B). The Advisory Committee notes clarify that it is no longer sufficient for the prosecution to provide a notice that merely identifies the "general nature" of the evidence. *See* Committee Notes on Rules—2020 Amendment. Rather, "[t]he prosecution must not only identify the evidence that it intends to offer pursuant to the rule but also articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose." *Id*.

**STATEMENT OF FACTS.**

In this case, the government provided the defense with a six-page 404(b) disclosure on August 14, 2026, the deadline that was stipulated to by the parties. *See* Declaration of Taylor Fatherree (Fatherree Decl.), Exhibit A; Dkt. 47 at 1. The notice states that the government "may introduce the following evidence at trial, either as evidence that is inextricably intertwined with the conduct charged in the Information and/or as evidence 'proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident,' or another admissible purpose under Federal Rule of Evidence 404(b)." Ex. A at 1. The notice proceeds to list more than 44 items of evidence, ranging from messages between Mr. Giglio and his family members to search and web data and calendar entries.

On August 19, 2026, the defense contacted government counsel via email to advise counsel that the notice failed to comply with Rule 404(b)(3)(A) and (B). *See* Fatherree Decl., at ¶ 3. On September 9, 2026, defense counsel again contacted government counsel to request a more specific notice under Rule 404(b). *Id*. ¶ 4. The parties arranged a call and the government agreed to provide supplemental notice. *Id*.

More than a month after the original deadline, on October 5, 2026, the government provided the defense with a "supplemental" 404(b) notice. *See* Ex. B [Supplemental 404b]. At ten pages, this supplemental notice was nearly twice as long as the original 404(b) Notice. The

Supplemental Notice for the first time provided an explanation of how each item of evidence was admissible under Rule 404(b).

**ARGUMENT**

**I. The government's 404(b) notice was deficient.**

The voluminous notice submitted by the government is deficient in two respects. First, the notice repeatedly fails to identify the specific items of evidence that the government will seek to admit, referring generally to messages, web searches, and images without specifically identifying which images or messages the government will seek to introduce. For instance, the notice states the government will seek to introduce "Evidence of and relating to 'Images' data files, including, but not limited to: photographic images of firearms" retrieved from Mr. Giglio's iPhone. *See* Ex. A [404(b) Notice] at 6. But the notice does not specify *which* photos of firearms the government will seek to introduce.

Second, the more fundamental issue is that the government's notice fails to "articulate a non-propensity purpose for which the evidence is offered," as Rule 404(b)(3) requires. *See* Committee Notes on Rules—2020 Amendment. The Notice begins by listing all the permissible purposes under Rule 404(b), then listing all the evidence the government will seek to introduce. This makes it impossible to tell on what theory each item of evidence is supposed to be admissible. It is not clear, for instance, whether the government thinks an internet search relating to Congresswoman Ilhan Omar (on an unspecified date) proves "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The government has also failed to "articulate" its "reasoning" for *why* the evidence supports a permissible purpose, as the plain text of the rule requires. *See* Fed. R. Evid. 404(b)(3)(B); *see also* Committee Notes on Rules—2020 Amendment (the prosecution must explain "the basis for concluding that the evidence is relevant in light of [the identified non-propensity] purpose."). These deficiencies are particularly problematic because the notice lists ***forty-four*** items of evidence the government may seek to introduce.

To the extent the government argues that its supplemental 404(b) notice cures these deficiencies, this Court should reject that argument. Rule 404(b) recognizes that notice must be

given with enough "time . . . to allow the defendant a fair opportunity to meet the evidence." Fed. R. Evid. 404(b)(3)(A). In this case, a 404(b) disclosure deadline of August 14, 2026 was stipulated to by the parties. Dkt. 47 at 1. Defense counsel set the deadline for well in advance of the trial date and the due date for motions in limine to ensure that the defense would have sufficient time to prepare for the noticed evidence. By agreeing to this deadline, the government implicitly agreed that, on August 14, it would provide a notice that would comply with the express terms of Rule 404(b). It failed to do so.

Finally, the government has not identified any "good cause" for the delay in providing a notice that complies with Rule 404(b). *See* Fed. R. Evid. 404(b)(3)(C) (lack of pretrial notice may be excused upon a showing of good cause). The Note to the 2020 Amendment recognized that "[a] good cause exception for the timing of the articulation requirements is necessary because in some cases an additional permissible purpose for the evidence may not become clear until just before, or even during, trial." Committee Notes on Rules—2020 Amendment. But that is not the situation here. Rather, the notice failed to meet the articulation requirement for every single item of evidence. Thus, good cause does not justify the deficiencies in the government's Rule 404(b) Notice.

Exclusion is the only remedy that can ensure the government's compliance with the notice requirements of Rule 404(b) in the future. *See United States v. Vega*, 188 F.3d 1150, 1153 (9th Cir. 1999) ("Failure to provide notice or obtain an excuse from the district court, renders the other acts evidence inadmissible, whether the evidence is used in the prosecution's case-in-chief or for impeachment."). If the government does not suffer any significant consequences when it fails to meet the disclosure deadline, it will continue flouting the enhanced notice requirement. Allowing the government to do so would defeat the purpose of the amendment.

## II. The Court should exclude unnoticed 404(b) evidence.

As discussed above, Rule 404(b) recognizes that notice must be given with enough "time . . . to allow the defendant a fair opportunity to meet the evidence." Fed. R. Evid. 404(b)(3)(A). Similarly, Local Rule 16-1(c)(3) requires the Government to disclose "a

summary of any evidence of other crimes, wrongs or acts which the Government intends to offer under Fed. R. Evid. 404(b), and which is supported by documentary evidence or witness statements in sufficient detail that the Court may rule on the admissibility of the proffered evidence." Crim. L.R. 16-(1)(c)(3); *see also United States v. Mayans*, 17 F.3d 1174, 1183 (9th Cir. 1994) (explaining that if prosecution fails to make adequate disclosure, the trial court cannot "make the focused determination mandated" by Rule 404(b)). "Reasonable notice is designed to reduce surprise and promote early resolution of admissibility issues." *United States v. Vega*, 188 F.3d 1150, 1153 (9th Cir. 1999) (internal quotation marks and citation omitted). "Failure to provide notice or obtain an excuse from the district court, renders the other acts evidence inadmissible, whether the evidence is used in the prosecution's case-in-chief or for impeachment." *Id.* Accordingly, Mr. Giglio respectfully requests that this Court issue an order providing that any evidence subject to 404(b) that was not identified in the government's original Rule 404(b) notice is inadmissible at trial.

## III. The Court should exclude messages Mr. Giglio sent to other public officials.

The government seeks to introduce more than a dozen emails, voicemails, statements to law enforcement, and even media reports purporting to show that Mr. Giglio made threats to a variety of public officials.[1] Many of the messages are quite old—the oldest dates back to 2021, a full four years before the events of this case. None are admissible.

### A. Rule 404(b) applies because the messages are not inextricably intertwined with the offense.

The government argues these statements do not fall within the ambit of Rule 404(b) because they are "inextricably intertwined" with the offense. Ex. B at 2. That exception applies where evidence either (1) "constitutes a part of the transaction that serves as the basis for the criminal charge" or (2) is necessary to "permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime," such as to "explain either the circumstances under which particular evidence was obtained or the events surrounding the

[1] Specifically, Mr. Giglio objects to item nos. 1-2, 7-8, and 10(b)(ii) in the government's 404(b) Notice. *See* Exh. A at 1-5, 6.

commission of the crime." *United States v. Loftis*, 843 F.3d 1173, 1178 (9th Cir. 2016) (internal quotations and citation omitted). Neither option applies here.

To start, messages sent to other persons are not part of the "transaction" that serves as the basis of the charges here. The basis of the charges in this case consists of two phone calls made to Eric Swalwell. There is no scheme or conspiracy charged. *See generally* Dkt. 8. The jury's task is simply to decide whether Mr. Giglio made those phone calls while consciously disregarding a substantial risk that his communications would be viewed as threatening violence. *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). Statements made by Mr. Giglio to different persons in different contexts do not establish his intent to threaten Swalwell.

Even if Giglio previously intended to (and did) threaten other persons, intent to threaten "is not transferable across dissimilar and unique sets of circumstances." *See United States v. Charley*, 1 F.4th 637, 648 (9th Cir. 2021) (intent to assault one person does not tend to show intent to assault another). The only theory on which this evidence could be probative is a propensity theory: because Giglio intended to threaten others in the past, he must have intended to threaten Swalwell. But that is precisely the kind of impermissible inference that Rule 404(b) prohibits. *See Charley*, 1 F.4th at 650 (reversing due to Rule 404(b) error where "the jury was allowed to infer impermissibly that [prior, dissimilar assaults meant] Charley has a propensity for violence and thus must have intended to assault Begay.")

Moreover, the Ninth Circuit has cautioned that prior acts do not become "inextricably intertwined" with the offense merely because of temporal proximity. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012–13 (9th Cir. 1995); *United States v. Carpenter*, 923 F.3d 1172, 1180–81 (9th Cir. 2019). *Carpenter* demonstrates the distinction. There, the defendants were charged with kidnapping. 923 F.3d at 1176. To explain why the kidnapping had occurred, the court admitted evidence that the defendants and victim were involved in drug trafficking marijuana for the Mexican cartel, and when marijuana went missing, the defendants decided to turn over the victim to the cartel to protect themselves. *Id*. The Ninth Circuit held that evidence regarding the missing marijuana was "inextricably intertwined" with the offense, as it was needed to provide a coherent story regarding the kidnapping. *Id*. at 1181.

However, the government also sought to introduce evidence that the defendants stopped at a friend's home (mid-kidnapping) to smoke methamphetamine while they waited to hear from the cartel. *Id*. at 1176-77. The court found that the defendants' personal use of methamphetamine was not inextricably intertwined, with the offense, notwithstanding the fact that it took place in the middle of the offense. *Id*. at 1182. The Court instead reiterated that "[c]oincidence in time is insufficient" and a "sufficient contextual or substantive connection" to the charged offenses was required to find the evidence inextricably intertwined. *Id*. (quoting *Vizcarra-Martinez*, 66 F.3d at 1013). The Court found no such connection, rejecting the government's argument that methamphetamine use helped rebut the duress defense. *Id*.

*Carpenter* helps illustrate why even messages that were sent close in time to the charged offenses are not necessary to tell a coherent story of the offense. The government's theory is not that Mr. Giglio, upset by one specific event, hatched a plot to threaten a specific group of political officials, one of which was Mr. Swalwell. Instead, the government's theory is that when Mr. Giglio gets upset by political events, he threatens people—and because he's done that before, he must have done it to Mr. Swalwell. That is a propensity inference.

**B. None of the messages are admissible under Rule 404(b).**

In order for other acts evidence to be admissible under Rule 404(b), all four requirements must be met: the evidence must be material, not too remote in time, sufficient to support a finding that defendant committed the other act, and similar to the offense charged. *See Bailey*, 696 F.3d at 799. As discussed below, the government has failed to meet its burden of proving "the evidence meets all of the above requirements." *Arambula-Ruiz*, 987 F.2d at 602.

**i. Statements to Benson**

The government moves to admit a March 26, 2025 voicemail Mr. Giglio allegedly sent to Michigan Secretary of State Jocelyn Benson. Ex. A at 1. The message states: "Please let Jocelyn know that we're coming for her fucking dumb ass… Tell the bitch, daddy's coming, and we're going to put her in a fucking hole." *Id*. The government claims this is admissible because, "[u]nder the government's theory, Giglio engaged in both the charged and uncharged

acts as part of his common scheme and/or modus operandi to make threatening, intimidating, and/or harassing calls to targets of his political ire, and these acts were driven by the same underlying motivations." Ex. B at 2.

That is incorrect. To start, the government's suggestion that this qualifies as "modus operandi" evidence is spurious. The modus operandi exception allows the government to prove identity when "the elements of the prior offenses and the charged offense, . . . are sufficiently distinctive to warrant an inference that the person who committed the prior offense also committed the offense on trial." *United States v. Powell*, 587 F.2d 443, 448 (9th Cir. 1978). But here, Mr. Giglio's identity is not at issue—and even if it were, nothing about the manner in which these alleged offenses were committed is distinctive. This is not a case where anonymous calls were made using a unique voice filter or alias, to give some obvious examples. For these reasons, the modus operandi exception is clearly inapplicable.

The government next claims that "Giglio engaged in both the charged and uncharged acts as part of his common scheme . . . to make threatening, intimidating, and/or harassing calls to targets of his political ire, and [that] these acts were driven by the same underlying motivations." Ex. B at 3. That gives the game away. The government wants the jury to conclude that because Mr. Giglio has gotten angry and threatened other people in the past, he must have threatened Eric Swalwell. But that is precisely the kind of propensity inference that is forbidden under Rule 404(b).

Contrary to the government's suggestion, nothing indicates that the statement to Benson was driven by the same motivations as the message to Swalwell. And, as discussed above, even assuming Giglio's statement proved he intended to threaten Benson, it does not follow he must have intended to threaten Swalwell. The statements are simply too dissimilar to be material. Thus, this evidence must be excluded.

**ii. Statements to Gamble**

The government also seeks to admit statements made by Mr. Giglio to Travis County Judge Maya Guerra Gamble around May 2025. Ex. A at 2. The messages state in relevant part, "Keep going after Alex Jones bitch and we'll get you . . . . we're not gonna physically hurt you

we're gonna do way worse to you cunt. . . . Let her know that we're coming for this dirty fucking bitch. . . legally. . . . We're gonna fucking put her in prison for years." Ex. C [GIGLIO-000289].

For the reasons already discussed, this message must be excluded under Rule 404(b). The message has no bearing on the nature of Mr. Giglio's statements to Eric Swalwell. The statements to Gamble appear to be driven by a completely different motivation (the Alex Jones / Sandy Hook trial). And Mr. Giglio is clear in the messages that when he refers to "coming for" Gamble, he is not referring to physically harming her, but rather pursuing legal redress for her perceived misdeeds. It is unclear whether this message qualifies as a threat—and even assuming the statement proved Giglio's intent to threaten Gamble, it does not follow he must have intended to threaten Swalwell. Because the statements are simply too dissimilar to be material, this evidence must be excluded.

**iii. Statements to Garcia**

The government also seeks to admit statements Mr. Giglio allegedly made to Congressman Robert Garcia in February 2025. Ex. A Notice at 3. The government appears to be referencing a voicemail which states:

> Robert Garcia, I called you, left the nasty message last night both your places. I think you're a sick, disgusting, little fucking asshole, but I don't care that you're gay. I don't care that you're Peruvian. I care that you get up in our Congress and behave like a filthy liar, scumbag, someone who hates this country and I hate you, but I don't hate you because of what you look like or who you fuck you sick asshole. I just hate you the same point, I don't wish a painful death upon you. That's disgusting, and it makes me know better than your sick ass. But lucky to all you asshole. The last few days, I can't get a break. I'm dying, suffering, and you just keep fucking going with your bullshit.

Ex. D [GIGLIO-008455].

For the reasons already discussed, this message must be excluded under Rule 404(b). The message has no bearing on the nature of Mr. Giglio's statements to Eric Swalwell. While the message uses foul language, it does not contain any threats of physical violence, making it unclear whether this message qualifies as a true threat. And again, even assuming the statement proved Giglio's intent to threaten Garcia, it does not follow he must have intended to threaten

Swalwell. Because the statements are simply too dissimilar to be material, this evidence must be excluded.

**iv. Statements to MVM.**

The government also moves to admit statements Mr. Giglio allegedly made in October 2024 to the CEO of MVM, the company that enacted Donald Trump's family separation policy. Ex. A Notice at 4. The messages read, among other things, "Coming for you." "Watch your children. You fucking animals. Your kids are next I'm guessing. GO HIDE NOW." Ex. E [GIGLIO-000244].

For the reasons already discussed, these messages must be excluded under Rule 404(b). To start, the messages are too remote in time, taking place approximately five months before Giglio's first alleged communication with Swalwell. Moreover, the messages appear to be driven by a motivation—disagreement with the family separation policy—that is completely unrelated to Mr. Giglio's statements to Eric Swalwell. Thus, even assuming this statement proved Giglio's intent to threaten the CEO of MVM, it does not follow he must have intended to threaten Swalwell. Because the statements are simply too dissimilar to be material, this evidence must be excluded.

**C. More prejudicial than probative**

For similar reasons, even if the Court determines this evidence meets the requirements of Rule 404(b), it should still be excluded under Rule 403, as it is far more prejudicial than probative. Here, any marginal probative value from these messages is vastly outweighed by the risk of unfair prejudice to Mr. Giglio. *Old Chief*, 519 U.S. at 180 (unfair prejudice occurs when evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.") (internal quotation marks omitted). Here, the messages create a risk that the jury will feel animosity towards Mr. Giglio and convict him solely because it finds him an unpalatable person or disagrees with his political views. The evidence also will waste time, as Mr. Giglio will need to respond to explain why he sent each of these messages and why they were not intended as threats. At the very least, the Court should sharply

limit the number of statements the government is permitted to introduce, so as to avoid the "needless[] present[ation of] cumulative evidence." Fed. R. Evid. 403.

**IV. The Court should exclude evidence of Mr. Giglio's prior interactions with law enforcement.**

As discussed above, the government's 404(b) notice indicates that it intends to introduce evidence relating to Mr. Giglio's communications with several public officials, including Congressman Robert Garcia, Michigan Secretary of State Jocelyn Benson, and Judge Guerra Gamble, among others. The Notice is unclear regarding whether the government intends to introduce evidence that law enforcement contacted Mr. Giglio after some of these incidents. But to the extent the government does seek to introduce such evidence, the evidence should be excluded.

First, this evidence should be excluded under Rule 404(b) for many of the same reasons that the underlying statements made to the public officials should be excluded. The key issue with this evidence is that it is too dissimilar to warrant admission under Rule 404(b). The government appears to take the position that these law enforcement interactions show Mr. Giglio was warned that his statements were threatening, meaning when he called Swalwell, he understood there was a substantial risk that his communication would be taken as threatening. But that assumption does not follow.

First, it is unclear what law enforcement actually told Mr. Giglio regarding those earlier communications. For instance, one interaction reflects that the officer who called Mr. Giglio "explained that threats are not a protected form of free speech and threatening anyone is against the law." Ex. F [GIGLIO-017312]. According to this notation, Mr. Giglio was not told that the language he actually used was a threat and against the law. Indeed, in the next sentence, Mr. Giglio said "said he understood and did not feel he was threatening anyone." *Id*. Moreover, even assuming law enforcement had told Mr. Giglio that a specific communication was threatening, that would not necessarily put him on notice that different communications using different language might be perceived as threats.

Second, the evidence should be excluded under Rule 403. This evidence has little probative value: evidence that *different* communications using *different* language resulted in a law enforcement response has little bearing on the question of whether Mr. Giglio should have known that the specific communication he made to Mr. Swalwell might have been considered a threat. The evidence is only relevant to intent if (1) the government can show that Mr. Giglio used threatening language, and (2) that language is so similar to the language used with Mr. Swalwell that it he should have known his messages to Swalwell might be considered threats.

If the government is allowed to introduce this evidence, the defense will need to respond by (1) explaining that Mr. Giglio's messages did not constitute a true threat, and (2) introducing testimony regarding the law enforcement contacts that followed and what Mr. Giglio took away from those interactions. In essence, this will result in a series of time-consuming mini-trials regarding what Mr. Giglio said and understood on other occasions—creating precisely the kind of confusion of the issues and waste of time that Rule 403 seeks to prevent. *See, e.g., United States v. Yagi*, No. CR-12-0483 EMC, 2013 WL 10570994, at *7 (N.D. Cal. Oct. 17, 2013) (excluding evidence regarding prior accusation of sexual harassment because the parties would need to establish "(1) whether the incidents occurred; [and] (2) how they were perceived by [the defendant], resulting in "a mini-trial [that] would create a substantial risk of jury confusion and needlessly delay the trial."). Thus, the evidence should be excluded under Rule 403.

**V. The Court should exclude Mr. Giglio's alleged law enforcement admissions.**

The government also seeks to introduce a variety of post-arrest statements in which Mr. Giglio allegedly told law enforcement about "threatening/harassing conduct towards others." Ex. A at 2. This evidence must also be excluded, for similar reasons to those already listed above. In its supplemental notice, the government claims this conduct is inextricably intertwined with the charged conduct in this case. That is incorrect.

**A. Statement regarding Jasmine Crockett and Jamie Raskin**

The government seeks to introduce post-arrest statements made by Mr. Giglio regarding Jasmine Crockett and Jamie Raskin. Ex. A at 2. Specifically, after his arrest on June 27, 2025, Mr. Giglio allegedly stated:

> —and then I see like, Jasmine Crockett or Jamie Raskin saying such horrible [unintelligible] about you guys half the time . . . . and so I call them, and I go after them, and I do things like say, you know, if you read the article, you said you go out and you tell people that they need to get in the faces of MAGA Christians and this and that it's the reason people are getting shot in the back, right? And getting shot coming out of a theater. And so what? I tell them, look, you dirty whore, do you think men like me won't come and fucking rape your kids and put bullet in your head and kill you? And then I say, I would never do that, and I don't want that to happen to you, but that's what's gonna happen if you push it to a fucking point. Look at the history of the World, look at the wars. And I'm telling you, there's a lot of hate. I see the hate from these people on the left. They, you know, now you guys are kind of target, right? Um, whoever, they don't like. And they're angry and they're mental. And so I just said I'm going to give it back to the people who are turning them into this. Right? So if you read this article, they're like miffed, all these federal judges that I don't actually break the law. I said, right, Because I don't threaten anybody.

Ex. G [GIGLIO-000134] at 7:52-9:20.

Contrary to the government's argument, these post-arrest statements are not "inextricably intertwined" with the charged conduct in this case. Ex. B at 4. Post-arrest statements allegedly made to police are not part of the "transaction" that serves as the basis for the charges. Nor are these statements necessary to offer a coherent story regarding the commission of the crime: if these statements are excluded, the government's theory of the case remains intelligible. The fact that these statements were made close in time to the charged acts does not make them inextricably intertwined with the offense. *See Carpenter*, 923 F.3d at 1182 ("[c]oincidence in time is insufficient").

In addition, this evidence must be excluded under Rule 404(b). The government claims these statements show Mr. Giglio "knew, or was at least aware of the substantial risk, that his communications in the charged offenses would be taken as a true threat." Ex. B at 4. On the contrary, the statements show Mr. Giglio's belief that he "do[esn't] break the law" and "do[esn't] threaten anybody." Ex. G. The statement does not include an admission that Mr.

Giglio understood other people interpreted his statements as real threats. Because the government has not identified a permissible purpose for this evidence, it must be excluded.

**B. Statements regarding Jack Auchincloss.**

The government also seeks to introduce statements Mr. Giglio reportedly made after he was contacted by U.S. Capitol Police S.A. Killbride in April 2023. Ex. A at 2. Specifically, the government seeks to introduce "admissions by Giglio regarding voicemails sent to Congressman Jake Auchincloss on or about April 17, 2023." *Id.* This may refer to a portion of S.A. Killbride's report, which claims that Giglio "made the statements about hoping Auchincloss and his family dies to make a point." *See* Ex. H (GIGLIO-008572).

These statements are not "inextricably intertwined" with the offense. As already mentioned, even assuming Mr. Giglio meant to threaten other public officials, that does not establish that he intended to threaten Mr. Swalwell specifically. Nor does telling a coherent story of the crime allow the government to introduce any supposed threat made by Mr. Giglio, even ones that targeted entirely different people, took place years before the charged conduct, and used materially different language.

The evidence is also inadmissible under Rule 404(b). Contrary to the government's argument, generalized political resentment does not establish a common motive: Mr. Giglio could have well intended to threaten Mr. Auchincloss and not Mr. Swalwell. Moreover, given the differing language of the two communications, even assuming Mr. Giglio knew his language as to Mr. Auchincloss was threatening, it does not follow that he understood the same regarding the language he used as to Mr. Swalwell.

In the report, Agent Kilbride claims to have explained the general unlawfulness of threats. However, contrary to the government's argument, this is not sufficient to show knowledge. It does not establish that Mr. Giglio agreed his own communications were threatening; the same sentence records his contrary understanding.

In the alternative, the evidence must be excluded under Rule 403. Any marginal probative value this evidence has is substantially outweighed by the danger of unfair prejudice, risk of confusing the issues, and undue consumption of time. As with other communications,

Mr. Giglio would need to test the government's claim that he made these statements in the first place, as well as the specific words used, which will waste trial time. Moreover, this evidence creates a risk that the jury will convict Mr. Giglio simply because it disagrees with his political views or finds him an unsavory character—not because he committed the charged acts. For these reasons, the evidence must be excluded under Rule 403.

**C. Statements allegedly made on Parlor.**

The government also seeks to introduce another statement Mr. Giglio reportedly made to Agent Killbride in April 2023. Ex. A at 2. Agent Killbride claims Mr. Giglio "stated the FBI came to interview him after he replied to an individual on Parlor. He said the individual was trying to start some type of argument and he basically said if it came down to it, he would put them on their knees and shoot them in the head." Ex. H (GIGLIO-008572). There is no further information provided regarding when this alleged communication took place, who the recipient is, what the recipient may have said to provoke Mr. Giglio, Mr. Giglio's motivations for claiming he would shoot this person, or what the FBI Agents told Mr. Giglio when they allegedly visited him. Without any such information, the government cannot show that Mr. Giglio intended that statement as a threat, much less connect it to the statements made to Mr. Swalwell. The government simply cannot show this interaction put Mr. Giglio on notice that a different message to a different listener was threatening.

In the alternative, the evidence must be excluded under Rule 403. Any marginal probative value this evidence has is substantially outweighed by the danger of unfair prejudice, risk of confusing the issues, and undue consumption of time. As with other communications, Mr. Giglio would need to test the government's claim that he made these statements in the first place, as well as the specific words used, which will waste trial time. Moreover, this evidence creates a risk that the jury will convict Mr. Giglio simply because it disagrees with his political views or finds him an unsavory character—not because he committed the charged acts. For these reasons, the evidence must be excluded under Rule 403.

**D. Statement regarding killing federal agents.**

The government seeks to introduce a statement made by Mr. Giglio on June 30, 2025, after the charged offenses were committed. Notice at 2; Ex. I (GIGLIO-000291). The evidence shows that Mr. Giglio felt ill and was taken to the hospital shortly after a court appearance. While there, S.A. Dales claims that "Giglio spoke about his phone and spontaneously uttered 'You will see messages where I said I would kill federal agents.'" Ex. I (GIGLIO-000291). The other S.A. present (S.A. Farrar) did not hear Mr. Giglio say this. *Id*.

Even assuming Mr. Giglio made this statement, the government has not met its burden to show this evidence is admissible under 404(b).

To start, this Mr. Giglio's post-arrest statements to S.A. Dales are not "inextricably intertwined" with the offense because they are not part of the same transaction as the alleged offense, which involves alleged threats to murder Eric Swalwell. *Loftis*, 843 F.3d at 1178. The charged conduct in this case took place on March 27 and June 13, 2025. Mr. Giglio allegedly made these statements on June 30, 2025, more than two weeks later. Contrary to the government's argument, this statement does not show that Mr. Giglio understood that his communications to Mr. Swalwell were threatening at the time he made them.

The evidence is also not admissible under Rule 404(b) to prove intent. As alleged by the government, Mr. Giglio's statement is purely factual: "'You will see messages where I said I would kill federal agents.'" Ex. I (GIGLIO-000291). Mr. Giglio did not specify when he made those statements or who the recipient of the statements was. Mr. Giglio did not state that he understood those messages to be threats or intended them as such. And even if he had, the fact that Mr. Giglio intentionally made threats to other people does not establish that he intended to threaten Mr. Swalwell in particular.

Nor does this post-arrest statement show that Mr. Giglio understood statements he made to Mr. Swalwell could be perceived as threatening. Taking the post-arrest statement at face value, Mr. Giglio said he would kill federal agents. But the statements made to Mr. Swalwell use completely different language: Mr. Giglio never said he would "kill" Mr. Swalwell.

Moreover, the evidence is not admissible under Rule 404(b) to prove a common scheme, modus operandi, or motive. It is unclear why Mr. Giglio allegedly sent these messages, so they cannot be used to prove motive. Moreover, it is unclear that Mr. Giglio ever sent them to the federal agents, as opposed to telling someone else that he wanted to kill federal agents. And even if he had, unspecified messages sent to unidentified federal agents cannot establish a common scheme or pattern of behavior. This evidence is simply too vague.

Even if this statement is admissible under Rule 404(b), it must be excluded under Rule 403. Any marginal probative value this statement may have—and given its vagueness, the probative value is minimal—is substantially outweighed by the danger of unfair prejudice it creates. *See* Fed. R. Evid. 403. The reference to "kill[ing] federal agents" creates a risk that jurors will convict Mr. Giglio solely because they perceive him to be dangerous. Moreover, the report acknowledges this alleged statement was only heard by S.A. Dales, Mr. Giglio will need to challenge whether the statement was even made and whether it was reported correctly. The defense will also need to present evidence regarding the fact that Mr. Giglio said this while in the hospital, raising questions about whether his cognition was impaired. In sum, the introduction of this statement will unduly consume trial time and has marginal probative value. Rule 403 requires exclusion.

**VI. The Court should exclude statements to FBI S.A. Ballantyne**

The government seeks to introduce messages Mr. Giglio sent to FBI Special Agent Ballantyne, complaining that the Agent was "bother[ing] his family and" failed to "leave [his] number or [his] contact info." Ex. J (GIGLIO-000288). In the messages, Mr. Giglio worries that the Agent is "not FBI" and claims he will contact the police, post what is happening on social media, and write an article. *Id.* (GIGLIO-000287).

The government's claim that this is "inextricably intertwined" with the charged offense fails. First, Mr. Giglio's statements to SA Ballantyne are not part of the same transaction as the alleged offense, which involves alleged threats to murder Eric Swalwell. *Loftis*, 843 F.3d at 1178. The statements were made to a completely different person, who unlike Swalwell is not a public official, and who Mr. Giglio feared was not an actual FBI agent. Importantly, the

statements do not contain any threats to cause physical harm, but merely to expose supposed bad behavior on social media. For similar reasons, these statements are not necessary to offer a coherent story regarding the commission of the alleged offenses. *Id*. The prosecution's theory in this case appears to be that Mr. Giglio had a pattern of "mak[ing[ threatening, intimidating, or harassing calls to targets of his political ire." Ex. B at 3. But Agent Ballantyne was not a target of Mr. Giglio's political ire—Mr. Giglio contacted him out of concern that his family was being harassed by a fake FBI Agent. That is an entirely different motivation.

**VII. The Court should exclude evidence of Mr. Giglio's firearms ownership.**

The government seeks to introduce evidence of Mr. Giglio's gun ownership, specifically "[e]vidence of and relating to Giglio's purchase, ownership, and/or possession of at least eleven registered firearms and other weapons between 2016 through 2025." The government also seeks to introduce photographs of firearms from Mr. Giglio's phone. This evidence should be excluded. The government first argues that Mr. Giglio's gun ownership is inextricably intertwined with his charged communications and therefore exempt form 404(b). Not so. Other act evidence is inextricably intertwined with the charged conduct when it is a part of the same transaction or is "necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Vizcarra-Martinez*, 66 F.3d at 1012–13. Neither is the case here. The alleged offenses would have been completed in this case after Mr. Giglio called the regional office. His legally owned guns are not a part of that call. Nor are they necessary to tell a coherent story. The government need only rely on the content of the calls for its argument that Mr. Giglio's words constituted true threats.

The government argues in the alternative that the guns should be admitted under 404(b) to show Mr. Giglio's "intent, opportunity, preparation, or plan." This argument also fails. A true threat does not require that "[t]he speaker . . . actually intend to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359–60 (2003). The government does not need to show that Mr. Giglio had any intention of actual harm. Further, there is no evidence that he did have that intention. Mr. Giglio took no steps to use his guns or even to travel to Mr. Swalwell's regional office. There is no evidence he had a plan of any kind to hurt Mr. Swalwell, let alone with

weapons. Therefore, evidence of his guns does not show intent to threaten or recklessness. Recklessness rests on whether Mr. Giglio understood and disregarded a substantial risk that his communications would be understood as threats. The guns do not factor into the presence or absence of this understanding—he had no reason to think the staff at the office knew about his actual gun ownership.

Additionally, any plan or preparation would have to be a plan to commit the charged offense—here, making the charged communications. But the guns do not show a plan to call Eric Swalwell's office, or preparation to do so. And again, it is not in dispute that Mr. Giglio did make these calls. As for opportunity, there is no dispute that Mr. Giglio made the calls in question, and the guns have nothing to do with his opportunity to have made the calls. Mr. Giglio did not need a firearm to leave a voicemail or make a phone call. Moreover, many of these firearms were acquired years before any phone call was made. Nothing suggests he acquired a firearm in preparation for either communication.

Last, the government argues that "because Giglio's charged threats involved the threatened use of a specific firearm that he owned (.308) as well as a more general threat of violence, proof that he actually owned the .308 and other firearms tends to show that his threats communicated a serious intent to inflict unlawful violence or physical harm." Ex. B at 5. Again, this is unsupported by the evidence. Mr. Giglio took no steps to actually harm anyone, so his gun ownership does not increase the seriousness of his statements. The firearms later recovered did not make his voicemail any more threatening to those who heard it, even though one of those firearms was mentioned in the call.

Instead, the government seeks to introduce the guns to show propensity: Mr. Giglio has guns, so he is violent, and he means harm by these communications. That is exactly what is prohibited by the rule.

Other threats cases that have allowed evidence of firearms possession are distinguishable. In *Unites States v. Sutcliffe*, evidence of the defendant's rifle possession was allowed as evidence of his specific intent to threaten. 505 F.3d 944, 958-959 (9th Cir. 2007). In affirming, the Ninth Circuit pointed out that circuits that had concluded weapons possession

evidence in similar cases did not have the then-required mens rea in the Ninth Circuit of specific intent to threaten. *Id*. at 959. Since *Counterman*, the mens rea is recklessness, not specific intent to threaten. 600 U.S. at 69. The government in this case therefore has an entirely different (and lower) intent to prove. In addition to the higher mens rea relied on by the Ninth Circuit, the defendant in that case claimed that the phrase "I am now armed" meant armed with information. *Id*. at 959. There is no such factual contention here—everyone agrees that Mr. Giglio was referencing a weapon in his charged voicemail. *Sutcliffe* is inapposite.

**VIII.The Court should exclude Messages to unknown recipients.**

The government seeks to introduce numerous messages from Mr. Giglio to unknown recipients. None of them appear to have been sent to Eric Swalwell, his staff, or any congressional office. All of the below messages were sent at least two years before the earliest charged conduct in this case. Some of them were sent more than four years beforehand. The government again seeks to introduce inflammatory propensity evidence: he said many nasty and upsetting things before, so he must have made true threats in this case. This evidence should not be allowed. The messages are included below:

1. iMessage on 02/04/2023: "Fuck all leftist scum time to start killing little bitches"
2. iMessage on 09/29/2022: "Kamala Harris is a fucking idiot embarrassing our country again somebody needs to shoot that dumb ["n-word"] Obama, blow up those lying hate filled cunts like Hillary what a bitch"
3. Facebook Messenger message on 01/05/2022: "This is your warning you piece of shit you laugh you find your way to the page of a woman who died 46-year-old mother and I'm gonna fucking come find your wife you fucking piece of shit"
4. Facebook Messenger message on 09/30/2021: "Rascist [sic] bitch, elitist bitch I can't wait till we get to come for your kind"
5. Facebook Messenger message on 09/30/2021: "Die"
6. Facebook message on 02/05/2021, including, but not limited to,: "Ok here is the simple fact. I am coming for you. . . .You were so easy to find. See you soon and please take this lightly"

7. Facebook message on 08/30/2020, including, but not limited to, the excerpt: "I'm heading to Portland these fuckers are in that it's over there's thousands coming. . . .hope the president invoked the insurrection act and these fuckers start going to jail or else they're going to be killed that's the bottom line not by me I'm just going to advocate for torture and beatings"
8. Facebook message on 08/30/2020, including, but not limited to, the excerpt: "I can't fucking do the one thing that I wanna go fucking fire bomb these fucking piece of shit. . . .FUCK FACEBOOK AND ZUCKERBERG I HOPE SOMEONE GETS YOUR ASS MARK! You are one ugly bitch"

The government also seeks to introduce messages from others in response to, or in conversation with, the above messages sent by Mr. Giglio.

This evidence does not tend to prove a material point. It does not have any bearing on what Mr. Giglio did on the dates in question or what his intent was. Mental state is not fixed and these messages from years earlier to different audiences do not help show what his mental state was at the time of the charged conduct.

These messages are also too remote in time to provide probative value, occurring two to four-and-a-half years before the earlier offense date in this case. *United States v. Alfonso* illustrates this point. 1985). There, the government offered evidence that, over four years before the charged drug conspiracy, the defendant had asked a longshoreman to help him offload cocaine from a ship. *Id*. at 739–40. The government offered it to prove intent, knowledge, and modus operandi. The Ninth Circuit reversed. It acknowledged that a five-year gap does not "automatically require excluding the evidence." But it called the evidence an "ancient conversation" that did "not at all . . . illuminate" the defendant's charged conduct "nearly five years later." *Id.* at 739–40. After all, "[p]roof of an intent to do one thing on an earlier occasion proves little about an intent to execute a dissimilar act at a later time." *Id*. at 740. The only inference left was that the defendant "was likely a sometime smuggler," meaning Rule 404(b) required exclusion of the evidence. *Id*.

The Ninth Circuit later relied on *Alfonso* for the proposition that "[o]rdinarily, five-year-old evidence of drug sales will not be particularly probative of intent to sell drugs today." *United States v. Hegwood*, 977 F.2d 492, 496 (9th Cir. 1992). It also reversed a conviction based on evidence of drug use five years before the charged conspiracy, finding that the risk the jury would draw a propensity inference "far outweighed" the evidence's limited value. *United States v. Hill*, 953 F.2d 452, 457–58 (9th Cir. 1991) (citing *Alfonso*, 759 F.2d at 738–40). The messages from those drug cases is equally applicable here: prior threatening messages, in and of themselves, are not particularly probative of intent.

That is particularly true because the messages the government seeks to admit are substantially dissimilar to the charged conduct, since they are online text messages rather than calls to a public figure's office. Several seem to be part of online arguments, the context of which is not provided. Many of them do not express intent by Mr. Giglio to do anything. For these reasons, the messages are too dissimilar and immaterial to warrant admission under Rule 404(b).

For the same reasons, the messages are highly prejudicial and have little probative value, and should be independently excluded under Rule 403. Fed. R. Evid. 403. Mr. Giglio's current criminal case is not about every offensive thing he has ever said or every angry outburst. This would lead to numerous "mini trials" on the context of the messages, whether any of these statements contain a threat, and what that means for the current charges. The messages also contain inflammatory and offensive language, making them exactly the type of "other bad act" evidence that Rule 404(b) prohibits to prevent the jury from convicting on an improper basis. *See United States v. Hodges*, 770 F.2d 1475, 1480 (offered evidence was the type of evidence that "makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.") (internal citation omitted

**IX. The Court should exclude evidence of Mr. Giglio's messages to family and recordings of family arguments.**

The government seeks to introduce numerous other messages by Mr. Giglio to family members, as well as audio files in which Mr. Giglio makes violent statements to family members. Specifically, the government seeks to introduce:

1. Email messages exchanged with "Dick Giglio" (dick@quadrasource.com), on or about May 28, 2025, with Subject: "Re: My Life"
2. Evidence from and relating to "Audio" data files, including, but not limited to, the following: audio files capturing a conversation/altercation involving Giglio and his son (with others present), in which Giglio makes statements such as: "I'd like to get your gut in my gun and put a bullet in your head right now"; "give me the Kimber back or I'll tear your room apart"; "I'll go get my gun right and now and come back you assholes."
3. SMS messages on 06/25/2025 to "Jake," "Maria," and "Richard Giglio," including, but not limited to: "I hope you fucking has a heart attack today"; "Hopefully it's just the FBI coming to talk to me for Dan Bongino and it's low under the convers so then I can really go after guys like they can hire me and I'll start first going after your pop put his ass in jail. He needs it. Start locking up these calm bastards."
4. iMessage statements on 06/25/2025 to "Jake" and "Richard Giglio," including, but not limited to: "send them to me I'll put a fucking bullet in their head"

These communications show that Mr. Giglio uses violent and offensive rhetoric. That, again, is character evidence. As discussed in more detail below, none of the government's theories for why this evidence is admissible are sufficient.

First, contrary to the government's argument, these messages are not inextricably intertwined with the charged conduct, an argument the government seems to be making for every offensive or violent statement Mr. Giglio has ever made. None of these statements are part of the same transaction as the charged conduct, nor are they at all necessary to tell a coherent story. *See Vizcarra-Martinez*, 66 F.3d at 1012–13. The government then offers a laundry list of possible 404(b) grounds for admission: "among other things, the defendant's intent, motive, knowledge of his actions, common scheme or plan, identity, and lack of mistake

or accident." All of these go through the propensity box. The government's following sentences are telling:

> Evidence of the defendant's explicit threats to "kill" or commit physical harm to others also shows that he knew how to communicate a serious intent of unlawful violence. This tends to support the government's theory that, when he engaged in the charged offenses, he intended and knew how to make a threat that both put his targets in serious fear of physical harm (but he could still argue was cloaked by the First Amendment), and that he was well aware that his communications in the charged offenses would be taken as a true threat.

This is pure character evidence. What is the inference? Mr. Giglio made violent statements in the past and has a character for doing so, which he acted in accordance with in this instance. The contention that Mr. Giglio "knew how" to make threats is particularly ludicrous. No one disputes that Mr. Giglio knows how to make a threat. This is a thin cloak for the argument that he said violent or threating things before, that is the kind of person he is, and the jury can assume he did so again here.

This evidence offers little probative value as to what Mr. Giglio's intent was on the dates in question, when communicating with different people, in different circumstances. Once again, it is highly prejudicial, and creates an enormous risk that the jury will convict him for other bad behavior rather than the charged conduct. It should therefore be independently excluded under Rule 403. *See* Fed. R. Evid. 403.

**X. The Court should exclude messages sent to others.**

The government seeks to introduce numerous other messages from Mr. Giglio to various recipients. None of these messages appear to have been sent to Eric Swalwell, or his staff.

1. SMS statements on 05/27/2025 to +19512564203: "Don't call me again faggots I'm gonna find you and Im gonna come put a bullet in your fucking head"
2. iMessage statements on 05/22/2025, including, but not limited to: "we're gonna hang his ass [Mangione] in front of everybody if I had the money I'd pay to have somebody kill him in jail. . . .if someone does that, I'll fucking shoot them in the face. . . ."

3. iMessage statements on 04/17/2025 to "Neg G," including, but not limited to: "I'll fucking start killing people I'll kill that bitch stupid fucking white bitch but before so you guys keep it up."
4. iMessages on 02/21/2025, including, but not limited to: "i'm gonna fucking tear this fucking place apart I would not if I were you I wouldn't recommend calling the local police because if they come here there's one way in and I will. It'll be a violent event.."; "and you're gonna see me I'm gonna fucking shoot myself in the head because of you fucking assholes cause you couldn't be fucking decent."; "and before midnight my time I'm gonna put four rounds in my head unless anybody can convince me the dick has a chance not to be a fucking psychopath there is"; "NOPD I literally just shot a round off it through your roof deck. I fucking miss my rain but it's kinda like I don't really wanna die so it's kind of like a Russian roulette thing but I'll be dead sooner or later."
5. iMessage statements on 01/28/2025, including, but not limited to: "he offered me $2500 for the Long gun the 308. I guess I should take it. I hate it that was my favorite. That's that like helps me but it's like I have to get out there. I just wanna shoot it again."
6. SMS messages on 12/26/2024 to "Detective Laverty," including, but not limited to, the excerpt: "but the politics thing I'm pretty much over I don't think I'll be calling anybody anymore and I'll be careful with what I say."
7. Facebook Messenger message on 10/04/2024 to unknown: "We're coming. Time to pay you evil freak and your parents are toast. PAYBACK coming and you're done BITCH"
8. iMessage on 09/05/2024 to "Pat Park," including, but not limited to, the excerpt: "I hope somebody shoots that fucking right in the fucking head seriously deserves to die."
9. iMessage on 09/03/2024 to "Nes G," including, but not limited to, the excerpt: "FBI just come here and I fucking kill six of them then I'll kill myself type thing you know I will take out some of these motherfuckers at their house at their coffee shop then I'll take myself. . . ."
10. iMessage on 08/15/2024 to "Nes G," including, but not limited to, the excerpt: "I would fucking put a bullet if somebody said you can kill Rachel Maddow right now and not go

to jail. I would fucking shoot her right fucking eyes she's a dirty fucking stupid fucking Dyke. . . ."

11. iMessage on 07/20/2024 to "Nes G," referencing Congresswoman Sheila Jackson Lee's passing: "burn in hell dirty old bitch"
12. Facebook message on 07/24/2024 to unknown, including, but not limited to, the excerpt: "I apologize this is no threat. I just want the FBI to be burnt to the ground and every piece of shit either put up against the wall and shot or fucking hung like traders. . . ."
13. iMessage on 07/16/2024 to "Nes G," referencing a FBI employee: "I hope this bitch gets killed now"
14. iMessage statements on 07/14/2024, including, but not limited to: "see now we're gonna go and beat down these leftist fuckers. . . . In fact they're gonna get killed if they try shit. I'm gonna go help"
15. iMessages on 05/02/2024, including, but not limited to: "I know some guys are gonna start killing these faggots and I'm gonna fucking cheer."; "Jake, I am not going to shut up because some little Nazi pricks for all I care they could try to beat me up. I'll fucking put some bullets in these faggots. . . .so any fucking faggots cop that tries to arrest me I'll fucking shoot his ass fuck him"
16. SMS message on 4/10/2024 to +18049420162: "Go FUCK YOURSELF DEEP STATE PIG I WISH YOU DIED THAT BULLET MISSED! LOUISANA RIF RAF SCUM, you, Johnson and Kennedy should douse yourself in gas and LIGHT IT UP YOU FUCKING RINO SCUM"

The main difference between these messages and the previous Section VIII's messages is that many of the recipients are known. They should still be excluded for the other reasons stated in Section VIII. *See* Fed. R. Evid. 403, 404(b). The government seeks to introduce them as propensity evidence. They are highly prejudicial given their offensive and angry language, but offer little insight into Mr. Giglio's mental state at the time of the alleged offenses. None of them reference Eric Swalwell.

Most of the messages express wishes ("I hope this bitch gets killed now"; "I hope somebody shoots that fucking right in the fucking head"), predictions about others ("some guys are gonna start killing"; "they're gonna get killed if they try shit"), a comment on Representative Sheila Jackson Lee after her death, an impossible hypothetical about Rachel Maddow ("if somebody said you can kill Rachel Maddow right now and not go to jail"), reactions to the Mangione case, and a message that begins, "I apologize this is no threat." Threat statutes do "not criminalize predictions or exhortations to others to injure or kill." *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011).

The May 2, 2024 ("any . . . cop that tries to arrest me I'll fucking shoot his ass") and September 3, 2024 ("FBI just come here and I fucking kill six of them then I'll kill myself") messages are hypotheticals, sent to friends, about what Mr. Giglio would do if law enforcement came for him. They have nothing in common with the charged calls. Their only real effect would be to tell a jury that Mr. Giglio is dangerous to law enforcement.

The messages are full of homophobic, misogynistic, and racial slurs. They include commentary on public figures, suicidal statements, and violent statements. The Ninth Circuit has warned that material whose "repugnant and self-absorbed embrace of destruction is likely to have swayed jurors' emotions, leading them to convict . . . not because of the facts before them but because [the defendant] represented a threat to their own values" is "highly prejudicial." *United States v. Waters*, 627 F.3d 345, 356 (9th Cir. 2010). By contrast, the probative value of these messages is slight. The jury will hear both charged communications in full, along with the staff's reactions. Sixteen sets of uncharged messages, on top of the Section VIII messages, would also require mini-trials on recipients, meaning, and context.

## XI. The Court should exclude unrelated firearm images, political searches, calendar entries, and legal materials found on Mr. Giglio's phone.

The government seeks to introduce a collection of materials extracted from Mr. Giglio's phone: images of firearms; a screenshot of the seditious-conspiracy statute; searches and contact information concerning political figures and organizations other than Congressman Eric Swalwell; calendar entries concerning firearms and other political figures; and a note

identifying an analysis of a federal debt-collection statute. According to the defense's review of the disclosed materials, these items span several years, concern different subjects, and have not been tied to a single undertaking involving the charged communications. The government nevertheless characterizes them as "inextricably intertwined" with the charged conduct or as evidence of Mr. Giglio's mental state.

Neither characterization supplies the missing connection. The government must identify what each item actually proves about the charged offenses and explain how it proves that fact without relying on an inference that Mr. Giglio is a politically hostile, firearm-interested, or otherwise dangerous person who therefore likely committed the charged offenses. Rules 404(a) and 404(b) prohibit precisely that use of character evidence. *See* Fed. R. Evid. 404(a)(1), (b)(1). And even evidence offered for a permissible purpose remains subject to exclusion under Rule 403. The evidence offered here cannot survive review under 403.

**A. The "inextricably intertwined" doctrine does not make the contents of a defendant's phone admissible as a unit.**

The Ninth Circuit recognizes two categories of evidence that may fall outside Rule 404(b) because they are inextricably intertwined with the charged offense: evidence that constitutes part of the transaction underlying the charge, and evidence necessary to permit the prosecution to present a coherent and comprehensible account of the crime. *Vizcarra-Martinez*, 66 F.3d at 1012–13; *Carpenter*, 923 F.3d at 1180–81. Both categories require an actual connection to the charged events, not merely a broad thematic resemblance.

*Carpenter* demonstrates the distinction. There, the circumstances surrounding missing marijuana in a drug trafficking case explained why the defendants kidnapped the victim and were admissible as necessary background. But the government additionally sought to introduce the defendants' methamphetamine use during the kidnapping. The court found that the personal use was not inextricably intertwined, notwithstanding its temporal proximity and some asserted relevance to their state of mind. *Carpenter*, 923 F.3d at 1181-82. The court instead required a

"sufficient contextual or substantive connection" to the charged offenses and reiterated that for the acts "[c]oincidence in time is insufficient." *Id.* (quoting *Vizcarra-Martinez*, 66 F.3d at 1013).

The same analysis forecloses treating the challenged phone contents as an undifferentiated body of intrinsic evidence. Their existence on a device owned by Mr. Giglio does not establish that they were part of the same transaction. Nor does their general relationship to firearms, politics, or legal research establish that they are necessary to explain the charged threatening communications. If temporal coincidence during an ongoing kidnapping was insufficient in *Carpenter*, creation and storage on a phone prior to and during the time when Mr. Giglio allegedly engaged in threatening communication  cannot substitute for the necessary substantive connection here.

The relevant question is what part of the charged events would become incoherent without each disputed exhibit. On the present proffer, the government has not identified any such gap. Instead, none of the evidence on the phone is necessary as the government can present the charged communications, evidence identifying their speaker, the circumstances in which they were made and received, and any properly connected evidence of Mr. Giglio's mental state without introducing unrelated political searches, years-old firearm reminders, or an unexplained screenshot of a different criminal statute.

The defense does not contend that evidence becomes inadmissible merely because the government can prove its case without it. Rather, where the government invokes the particular exception for evidence necessary to tell a coherent story, it must establish that necessity. Evidence that merely supplies a more prejudicial portrait of the defendant is not necessary narrative context. *See Carpenter*, 923 F.3d at 1182–83.

**B. The firearm images do not establish threatening intent merely because they depict firearms.**

The government seeks to introduce numerous firearm images associated with dates in 2024 and 2025. Each of the images the government seeks to bring in found on Mr. Giglio's phone are listed below with the metadata associated with the image:

| Image | File Name | Creation Date |
|---|---|---|
|  | 27B6A1DB-E1F2-4540-89EA-16487D726714_4_5005_c.jpeg | 2024-01-23 11:29:55 PM(UTC-8) |
|  | 5005.JPG | 2024-02-23 5:09:29 PM(UTC-8) |
|  | 5005.JPG | 2024-02-23 11:47:08 PM(UTC-8) |
|  | 5005.JPG | 2024-02-23 11:47:12 PM(UTC-8) |

| | | |
|---|---|---|
|  | 5005.JPG | 2024-07-02 6:51:51 PM(UTC-7) |
|  | 5005.JPG | 2024-07-02 6:51:52 PM(UTC-7) |
|  | 5005.JPG | 2024-07-02 6:51:53 PM(UTC-7) |
|  | 5005.JPG | 2024-07-02 6:51:54 PM(UTC-7) |

| | | |
|---|---|---|
|  | 5005.JPG | 2024-10-09 2:41:54 AM(UTC-7) |
|  | 5005.JPG | 2024-11-13 8:05:40 AM(UTC-8) |
|  | IMG_5859.HEIC | 2024-12-19 1:35:39 PM(UTC-8) |

| | | |
|---|---|---|
|  | IMG_5857.HEIC | 2024-12-19 1:35:40 PM(UTC-8) |
|  | IMG_5853.HEIC | 2024-12-19 1:35:43 PM(UTC-8) |
|  | 2732E8F7-B183-4919-9AD1-AB00BDC59973_4_5005_c.jpeg | 2024-12-19 3:41:51 PM(UTC-8) |
|   | 5005.JPG | 2025-02-14 10:08:30 AM(UTC-8) |

| Count 1-3 Allegation Date: March 27, 2025 | | |
|---|---|---|
|  | PhotosSearchSection-at_5_3697619B-AD97-494B-B0C7-25F3EBBB818A.png | 2025-05-13 6:36:33 PM(UTC-7) |
|  | PhotosSearchSection-at_6_3697619B-AD97-494B-B0C7-25F3EBBB818A.png | 2025-05-13 6:36:33 PM(UTC-7 |
|  | PhotosSearchSection-at_7_3697619B-AD97-494B-B0C7-25F3EBBB818A.png | 2025-05-13 6:36:33 PM(UTC-7 |
|  | 2747b410-47a2-11f0-9742-1fef65bbe5b9.jpg | 2025-06-12 8:30:21 AM(UTC-7) |

| Count 4 Allegation Date: June 13, 2025 | | |
|---|---|---|
|  | IMG_6374.HEIC | 2025-06-22 1:53:00 AM(UTC-7) |

None of these images satisfy the four-part test required for admission under 404(b). *See Vizcarra-Martinez*, 66 F.3d at 1013. An image of a firearm is not itself proof that Mr. Giglio possessed that firearm, acquired it, intended to acquire it, or connected it to a charged communication. And a commercial image, in particular, cannot be treated as a photograph documenting actual possession without additional evidence. The government is not seeking to admit evidence that Mr. Giglio sent any of these photos to anyone in Swalwell's office nor that he owned any of the specific firearms. Instead, the admission of the photos would not tend to prove a material point. The dates of many of the images are too remote in time. And, while intent is at issue in the case, they do not shed light on Mr. Giglio's intent.

By seeking to admit this evidence the government instead runs the risk of the jury engaging in prejudicial inferences from the admission of the images. The prohibited chain is apparent: Mr. Giglio saved firearm images; therefore he is dangerous or inclined toward violence; therefore he likely possessed the mental state required for the charged offenses. Mr. Giglio's saving of these images does not provide evidence of the "intent" for this case. Calling the final inference "intent" does not eliminate the character inference on which it depends. See Fed. R. Evid. 404(b)(1).

Finally, the images present a substantial Rule 403 danger. A succession of firearm photographs may create an impression of that Mr. Giglio is a dangerous individual because he has an arsenal or a sustained course of preparation even where the evidence establishes only the presence of image files. That impression invites a verdict based on feared future dangerousness rather than proof of the charged offenses. Where the connection to those offenses is

speculative, the danger of unfair prejudice, confusion, and needless cumulative presentation substantially outweighs the images' limited probative value. See Fed. R. Evid. 403.

**C. The screenshot of the seditious-conspiracy statute invites an unsupported inference of a separate, inflammatory criminal purpose.**

The government also seeks to introduce a screenshot of the seditious-conspiracy statute, 18 USC § 2384. Mr. Giglio is not charged with seditious conspiracy. It is unclear when the screenshot was taken and the circumstances explaining why it was saved remain unclear.

The screen shot, as shown below, appears to have been taken from the Cornell Law School, Legal Information Institute website, available at https://www.law.cornell.edu/uscode/text/18/2384.

## 18 U.S. Code §2384. Seditious conspiracy

U.S. Code Notes

prev | next

If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

(June 25, 1948, ch. 645, 62 Stat. 808; July 24, 1956, ch. 678, §1, 70 Stat. 623; Pub. L. 103–322, title XXXIII, §330016(1)(N), Sept. 13, 1994, 108 Stat. 2148.)

The screenshot establishes, at most, that an image containing statutory text was present on the phone. It does not itself establish agreement with the conduct described in that statute, an intention to undertake that conduct, or a connection between the statute and the charged communications. Reading or saving a law is not an admission of an intention to violate it.

The government should therefore be required to identify the specific language on which it relies, the foundation for attributing a relevant act of acquisition or review to Mr. Giglio, and the non-propensity reasoning connecting that act to an issue in this trial. An unexplained reference to "motive" or "intent" cannot bridge the gap between possessing legal information and intending a charged threat.

The Rule 403 danger is particularly acute. The phrase "seditious conspiracy" invites the jury to associate Mr. Giglio with a separate and inflammatory criminal undertaking. The exhibit risks transforming a trial about specified communications into an inquiry about an uncharged conspiracy against the government. Explaining the statute and litigating competing theories about why it appeared on the phone would introduce collateral issues without resolving the missing connection to the charged conduct.

**D. Searches for other political figures do not establish a common plan to threaten them.**

The government seeks to introduce searches, screenshots, downloads, or contact information relating to the Clinton Foundation, the White House, Congressmen Mike Gallagher, Ken Buck, and Jared Moskowitz, and Congresswoman Ilhan Omar. The government characterizes these materials as part of a common scheme to contact "targets of his ire." However, the government has not identified threatening communications to these individuals or organizations arising from these searches.

Looking up a political figure or saving publicly available contact information does not, without more, identify that person as a target of hostility, much less a planned criminal threat. The searches do not become threatening acts because the government groups them together and describes them that way.

A permissible plan theory requires an explanation of how the particular acts form part of a plan relevant to the charged conduct. Here, the asserted connection appears to be that Mr. Giglio sought information about multiple political figures and therefore must have been pursuing a broader threatening campaign. Without evidence connecting the searches to such a campaign, that theory depends on speculation or a generalized inference about his disposition toward public officials.

Knowledge and opportunity fare no better on the present proffer. If the government claims that the materials establish an ability to locate public contact information, it must explain why that ability materially advances an issue in dispute. An undisputed and readily established ability to obtain public contact information supplies little justification for introducing a collection of unrelated political names and inviting the jury to infer additional victims.

The Court should also reject the term "targets" unless the government first establishes a factual basis for it. That label adds a threatening purpose not established merely by the existence of search results or contact pages.

Under Rule 403, the evidence threatens to multiply the apparent scope of the case. Jurors may treat the named individuals as additional victims even though the government has not established corresponding threats. The defense would then be required to investigate and explain unrelated searches, political interests, and possible reasons for seeking contact information. Those collateral inquiries would distract from the charged communications and amplify unfair prejudice.

**E. The firearm calendar entries do not establish preparation for charged communications years later.**

The government seeks to admit calendar entries from Mr. Giglio's phone. The calendar entries the government seeks to admit are irrelevant. The chart below summarizes each of the calendar entries, their start date, and end date

| Calendar Notation | Start Date | End Date |
| --- | --- | --- |
| Get AR15 | 2021-10-19 2:00:00 PM(UTC-7) | 2021-10-19 3:00:00 PM(UTC-7) |
| Get Rifle Santa Ana | 2021-08-13 11:00:00 AM(UTC-7) | 2021-08-13 12:00:00 PM(UTC-7) |
| Have dad call about gun or do yourself | 2021-08-11 11:00:00 PM(UTC-7) | 2021-08-12 12:00:00 AM(UTC-7) |
| Get guns | 2021-07-12 1:00:00 PM(UTC-7) | 2021-07-12 2:00:00 PM(UTC-7) |
| CALL ABOUT GUNS | 2021-05-20 10:00:00 AM(UTC-7) | 2021-05-20 11:00:00 AM(UTC-7) |
| If you use a gun in any kind of crime 20yrs, if illegal gun 30 years! If your fire it 50 NO MATTER THE REASON | 2021-04-16 11:00:00 PM(UTC-7) | 2021-04-17 12:00:00 AM(UTC-7) |
| Pick up new gun | 2021-01-23 4:00:00 PM(UTC-8) | 2021-01-23 5:00:00 PM(UTC-8) |
| BUY 9mm auto loader!!!! Mace/pepper spray | 2020-06-19 1:00:00 PM(UTC-7) | 2020-06-19 2:00:00 PM(UTC-7) |
| Get Guns, 10mm and 9mm ammo | 2020-01-15 12:00:00 PM(UTC-8) | 2020-01-15 1:00:00 PM(UTC-8) |

Most of the listed firearm calendar entries bear scheduled dates in 2020 or 2021, several years before the charged conduct in 2025. They include "Get AR15," "Get Rifle Santa Ana," "Get guns," "Pick up new gun," and reminders concerning ammunition.

Even assuming Mr. Giglio authored the entries at the listed times, reminders concerning firearm acquisition do not themselves establish acquisition, unlawful possession, or preparation for the charged conduct. The government must connect the contemplated activity to a charged communication rather than invite the jury to infer that longstanding firearm interest demonstrates a longstanding propensity for violence. The four-part Rule 404(b) inquiry requires examination of both materiality and remoteness; neither is satisfied merely by the shared subject of firearms. *See Carpenter*, 923 F.3d at 1182. It is that the passage of time,

combined with the absence of a demonstrated connection to the charged communications, makes the proposed inference particularly attenuated.

The entry discussing supposed sentences for using a gun in a crime presents additional confusion. As found in Mr. Giglio's phone, it states purported punishment rules without identifying their source or context. The entry does not identify a contemplated offense or connect its subject to Congressman Swalwell. Introducing it risks inviting jurors to treat generalized legal information as an admission of planned criminal conduct. It also introduces punishment concepts collateral to the jury's task.

To the extent the government claims these materials are necessary that Mr. Giglio had access to a firearm, Mr. Giglio would be willing to stipulate to the fact that he owned a 0.308. That would constitute adequate proof on this point with a substantially lower risk of prejudice.

**F. The political calendar entries must also be excluded.**

The government additionally seeks to admit political calendar entries of Mr. Giglio.

| Calendar Notation | Start Date | End Date |
|---|---|---|
| call white house | 2025-03-10 9:00:00 AM(UTC-7) | 2025-03-10 10:00:00 AM(UTC-7) |
| GET AHOLD OF BONGINO NO MATTER WHAT | 2021-11-05 1:00:00 PM(UTC-7) | 2021-11-05 2:00:00 PM(UTC-7) |

The entry "GET AHOLD OF BONGINO NO MATTER WHAT" bears a scheduled date in November 2021. The entry "call white house" bears a scheduled date of March 10, 2025, closer to the March 27 charged conduct. But proximity alone does not establish that a proposed call concerned threats, Congressman Swalwell, or a common criminal undertaking. *Carpenter* expressly rejects the idea that a temporal coincidence is sufficient to show an act is inextricably intertwined with the offense. *See Carpenter*, 923 F.3d at 1181.

Moreover, neither of these entries contains a threat. "NO MATTER WHAT" may communicate emphasis or urgency, but it does not establish that Mr. Giglio's objective in contacting Dan Bongino was a criminal one. Similarly, to the extent Mr. Giglio planned to "call [the] white house," that is entirely protected First Amendment activity. There is no suggestion Mr. Giglio planned to threaten whoever picked up his call at the White House. To the extent the government plans to argue that the jury can infer a threatening campaign from these ordinary calendar reminders, that unsupported propensity inference is barred by Rule 404(b).

### G. The debt-collection note does not establish an intention to harass a public official.

The government seeks to introduce a note dated May 7, 2024, whose body, as reproduced in the Mr. Giglio's phone, reads: "Analyses of Section 1692d – Harassment or abuse, 15 U.S.C. § 1692d." The referenced provision is part of the Fair Debt Collection Practices Act. It provides in relevant part that "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." *See* 15 U.S.C. § 1692d.

The government does not explain how this specific item of evidence is admissible under Rule 404(b). Nor can it. To the extent the government claims the note shows that Mr. Giglio conducted legal research in order to facilitate his harassment of others, the evidence cannot support that interpretation. The note does not contain an admission that Mr. Giglio intended to harass anyone—if anything, it suggests *he* might have been harassed by debt collectors.

The note must also be excluded under Rule 403 because any marginal probative value is outweighed by the risk of undue consumption of time. If the government is allowed to introduce this note, the defense will need to respond by presenting an alternative explanation: that Mr. Giglio's financial circumstances explain his interest in debt-collection law. This would require testimony about Mr. Giglio's stroke, his subsequent financial hardships, and his experiences with debt collection. The resulting collateral inquiry further weighs against admission under Rule 403.

**H. Altogether, the aforementioned phone evidence must be excluded under Rule 403.**

When the phone evidence is considered as a whole, its prejudicial effect becomes especially clear. Taken together, the evidence draws a prejudicial composite: to lay jurors, firearm images, political searches, legal references, and old calendar reminders may suggest that Mr. Giglio is an armed political extremist engaged in a broad threatening campaign—even though the government has failed to present any concrete evidence proving such a campaign.

This evidence also creates a danger that the jury will punish Mr. Giglio for constitutionally protected activity. Mr. Giglio is entitled to his political views, even if the jury disagrees with them. The government may suggest Mr. Giglio has a violent character from his interest in firearms, but the Second and First Amendments protect Mr. Giglio's interest in owning and learning about firearms. Rule 403 was enacted in recognition of the fact that certain evidence increases the risk that the jury will convict on an improper basis. That risk is especially present here.

Moreover, as noted above, admission of this trove of evidence would create substantial collateral litigation concerning the origin of certain phone images, the meaning of metadata, the purposes of web searches, and the reasons for saving statutory information. Those inquiries would unnecessarily consume trial time and risk confusing the charged offenses with uncharged conduct.

For all these reasons, the above evidence must be excluded as more prejudicial than probative under Rule 403.

## CONCLUSION

For the aforementioned reasons, Mr. Giglio respectfully requests the Court grant his motion. Mr. Giglio further requests the opportunity to file additional motions as necessary.

Respectfully submitted,

November 3, 2026
Dated

JODI LINKER
Federal Public Defender
Northern District of California

LISSET M. PINO
TAYLOR FATHERREE
CANDIS MITCHELL
Attorneys for Geoffrey Giglio