JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
TAYLOR FATHERREE, Bar No. 358709
LISSET M. PINO, Bar No. 346133
CANDIS MITCHELL, Bar No. 242797
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Lisset_pino@fd.org

Counsel for Geoffrey Giglio

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

GEOFFREY GIGLIO,

Defendant.

**Case No.:** CR 25–264 VC

**DEFENDANT'S OPPOSITION TO GOVERNMENT MOTIONS IN LIMINE**

Pretrial Conf.: November 17, 2026

Trial: December 1, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... ii

I. Opposition to government's MIL #1. .......... 1

A. Evidence of other alleged threats by Mr. Giglio and law enforcement response is neither inextricably intertwined with the charged conduct nor admissible under 404(b). .......... 1

B. Evidence of Mr. Giglio's communications to FBI agents after the charged conduct is inadmissible. .......... 3

C. Evidence of Mr. Giglio's firearm ownership is inadmissible. .......... 4

D. Evidence from Mr. Giglio's phone is inadmissible. .......... 4

E. The Reuters article is inadmissible. .......... 6

II. Opposition to government's MIL #2. .......... 7

A. Legal Standard .......... 8

B. Argument .......... 8

III. Opposition to government MIL #3. .......... 17

A. This statement is not hearsay. .......... 18

B. This statement is not an improper conclusion on an ultimate issue of law .......... 19

C. This evidence is not barred by Rule 403. .......... 19

IV. Opposition to government's MIL #4. .......... 20

V. Opposition to government's MIL #5. .......... 20

VI. Opposition to government's MIL #6. .......... 22

VII. CONCLUSION .......... 22

## TABLE OF AUTHORITIES

### Federal Cases


*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 14

*Crawford v. City of Bakersfield*,
944 F.3d 1070 (9th Cir. 2019) .......... *passim*

*Evalt v. United States*,
359 F.2d 534 (9th Cir. 1966) .......... 22

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998(9th Cir. 2004) .......... 19

*Larez v. City of Los Angeles*,
946 F.2d 630 (9th Cir. 1991) .......... 6

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) .......... 19

*Shannon v. United States*,
512 U.S. 573 (1994) .......... 21

*United States v. Acosta-Sierra*,
690 F.3d 1111 (9th Cir. 2012) .......... 14-15

*United States v. Bagdasarian*,
652 F.3d 1113 (9th Cir. 2011) .......... 14

*United States v. Birrell*,
421 F.2d 665 (9th Cir. 1970) .......... 22

*United States v. Chase*,
301 F.3d 1019 (9th Cir.) .......... 1

*United States v. Christian*,
749 F.3d 806 (9th Cir. 2014) .......... 13, 14

*United States v. Evans*,
728 F.3d 953 (9th Cir. 2013) .......... 20

*United States v. Haischer*,
780 F.3d 1277 (9th Cir. 2015) .......... 19-20

*United States v. Hanna*,
293 F.3d 1080 (9th Cir. 2002) .......... 18, 19

*United States v. Johnson*,
62 F.3d 849 (6th Cir. 1995) .......... 21

*United States v. Justus*,
162 F.4th 962 (9th Cir. 2025) .......... 5

*United States v. Kinney*,
2024 WL 3450988 (9th Cir. 2024) .......... 4

*United States v. Linehan*,
835 Fed. Appx. 914 (2020) .......... 2

*United States v. Lopez*,
913 F.3d 807 (9th Cir. 2019) .......... 18

*United States v. Martis*,
2024 U.S. App. LEXIS 5391 .......... 2

*United States v. Mende*,
43 F.3d 1298 (9th Cir. 1995) .......... 19-20

*United States v. Mitchell*,
812 F.2d 1250 (9th Cir. 1987) .......... 19

*United States v. Ortega*,
203 F.3d 675 (9th Cir. 2000) .......... 17

*United States v. Rogers*,
2026 U.S. App. LEXIS 14549 .......... 2

*United States v. Twine*,
853 F.2d 676 (9th Cir. 1988) .......... 8, 13

*United States v. Velazquez*,
1 F.4th 1132 (9th Cir. 2021) .......... 21

*United States v. Verduzco*,
373 F.3d 1022 (9th Cir. 2004) .......... 3

*United States v. Wall*,
593 F. Appx. 128 (3d Cir. 2014) .......... 8


**Federal Rules and Statutes**


18 U.S.C. 875 .......... 3

Fed. R. Crim. P. 12.2 .......... 7, 8, 11

Fed. R. Evid. 106 .......... 16

Fed. R. Evid. 401 .......... 15

Fed. R. Evid. 403 .......... 2, 4, 6, 19

Fed. R. Evid. 404 .......... *passim*

Fed. R. Evid. 602 .......... 13

Fed. R. Evid. 701 .......... 7, 12, 13

Fed. R. Evid. 702 .......... 13
Fed. R. Evid. 803 .......... 17, 20

## I. Opposition to government's MIL #1.

The government seeks to admit numerous pieces of evidence that it claims are inextricably intertwined with the charged conduct, or, alternatively, admissible under Federal Rule of Evidence 404(b). Dkt. 90.

### A. Evidence of other alleged threats by Mr. Giglio and law enforcement response is neither inextricably intertwined with the charged conduct nor admissible under 404(b).

Specifically, the government seeks to introduce:

> Evidence that Giglio made harassing or threatening communications, other than those in the charged offenses, that triggered a law enforcement response, including:
> a. Giglio's communications toward Michigan Secretary of State Jocelyn Benson on or about March 26, 2025, and the response that followed;
> b. Giglio's communications toward Travis County, Texas Judge Maya Guerra Gamble on or about May 9, 2025, and the response that followed;
> c. Giglio's communications toward the CEO of MVM, Inc., a Virginia-based company, on or about October 23, 2024, and the response that followed, including his recorded conversations with the Loudoun County Sheriff's Office in December 2024

Dkt. 90 at 1. The defense has already explained in its Motion to Exclude why each of these instances is inadmissible, and will not repeat every point here. Dkt. 85 at 7-12. However, a few points bear responding to. The government is flatly wrong that these events are inextricably intertwined with the charged conduct. The government cites three unpublished cases and one published case to support this claim. All are easily distinguished.

First, *Chase* involved a defendant charged with making threats against two FBI agents under §115(a)(1)(B). *United States v. Chase*, 301 F.3d 1019, 1026 (9th Cir.), *on reh'g en banc*, 340 F.3d 978 (9th Cir. 2003). Chase initially tried to enlist the agents' support in investigating and prosecuting his "enemies," then began targeting the agents after they refused. *Id*. The Ninth Circuit affirmed the district court's decision to admit evidence of Chase's prior threats to his "enemies," who were in a hit list alongside the agents. *Id*. As the Court explained, this evidence was inextricably intertwined with the charged offense because "the retaliation of today cannot be shown without proof of what happened yesterday when the person making the threat was

allegedly wronged by the person threatened." *Id*. at 1029-30. That is, of course, different from this case, where there is no evidence that Mr. Giglio decided to threaten Mr. Swalwell because of Giglio's prior communications to other public officials.

Second, *Martis*, an unpublished case, was reviewed for plain error because the defense did not object to admission during trial. *United States v. Martis*, 2024 U.S. App. LEXIS 5391, *2. That case simply states that the voicemails allowed in were inextricably intertwined with the charged offenses. There is no description in the opinion of the voicemails or their connection to the offenses. However, the district court record indicates that at least some of the previous voicemails were to the same victim as at least one of the charged counts, and the defendant was warned after contacting that particular victim yet did so again and threatened to kill her. Dkt. 56 at 3-4, Dist. Ariz., CR-21-08043 DJH. The combination of plain error review and warnings after prior communications to the same victim make this case dissimilar to Mr. Giglio's. *Martis* offers little support for the government.

Third, in *Rogers*, an unpublished case, recordings of calls placed by the defendant *were direct evidence of* one of the charges. *United States v. Rogers*, 2026 U.S. App. LEXIS 14549, *2. Obviously, that is not the case here. Text messages were also admitted under 404(b) after the four-part test was satisfied. *Id*.

Fourth, in *Linehan*, an unpublished case, the defendant was accused of threatening to firebomb an embassy. *United States v. Linehan*, 835 Fed. Appx. 914, 916 (2020). The court allowed evidence of the defendant's previous threat to firebomb a different embassy and the fact that he was warned about it after. *Id*. This is a case in which the defendant had been put on notice that nearly the exact same language used in the charged offense could be viewed as a threat. *Id*. at 916-17. The court also admitted previous emails sent by the defendant that he had attached to the charged email, clearly connecting them to the offense. *Id*.

This evidence should also be excluded under Rules 404(b) and 403, as discussed in the Defense Motion to Exclude. Dkt. 85 at 7-12. The law enforcement communications the government has chosen will be especially confusing to the jury. Detective Laverty tells Mr. Giglio he may be in violation of a Virginia computer harassment statute, and that "when you

put someone in fear, you're probably committing more crimes." Dkt. 90 at 10. This risks confusing the issues and the legal standards. The defense will also have to argue against these statements of the law and point out their differences from Mr. Giglio's actual charges. Similarly, Detective Coker explained the harassment law in Texas and had that in mind when warning Mr. Giglio. *Id*. at 9-10.

Although Special Agent Schnelle informed Mr. Giglio about 18 U.S.C. 875(c), it is not clear whether he told Mr. Giglio his statements to Jocelyn Benson crossed the line. Mr. Giglio explained to Special Agent Schnelle that he was not referring to violence in that instance and did not want to commit any violence. Nor is the *Verduzco* test met: the calls are not sufficiently similar, and the government seeks to infer the same purpose in the Benson and the Swalwell calls to say the Benson call proves a material point. *United States v. Verduzco*, 373 F.3d 1022, 1027 (9th Cir. 2004); *see also* Dkt. 85 at 7-8. That is a poorly disguised propensity inference: he meant to threaten Benson, that's the type of guy he is, and he acted in accordance with that character when he later called Swalwell.

**B. Evidence of Mr. Giglio's communications to FBI agents after the charged conduct is inadmissible.**

Specifically, the government seeks to introduce:

Evidence of Giglio's communications and statements to FBI Special Agent (SA) Ballantyne and other agents surrounding his arrest on June 27, 2025, including his postarrest statements and calls.

Dkt. 90 at 1. The defense discussed why this evidence is not admissible in its Motion to Exclude. Dkt. 85 at 13-14, 16-18. The government suggests in its motion that one reason for admission is to show knowledge of the Reuter's article. Dkt. 90 at 11. There is no dispute Mr. Giglio knew of the article, and the jury does not need to hear that he said, "and so what I tell them, look, you dirty whore, do you think men like me won't come and fucking rape your kids and kill you" for that purpose. The government cannot sneak in the most inflammatory of classic other bad acts evidence by saying it goes to Mr. Giglio's "motive and intent." Dkt. 90 at 11; *See* Fed. R. Evid. 404(b). If anything, sharing this information with the FBI shows a *lack* of

awareness by Mr. Giglio of the effect of his words. This would be extremely distracting for the jury and the risk of unfair prejudice is high. Fed. R. Evid. 403.

### C. Evidence of Mr. Giglio's firearm ownership is inadmissible.

The government seeks to introduce "Evidence of, and relating to, Giglio's purchase, ownership, and/or possession of firearms, including a .308 firearm, and other weapons, before, during, and after the charged offenses." Dkt. 90 at 1. The defense already laid out the reasons this evidence should not be admitted in its Motion to Exclude. Dkt. 85 at 18-20. As explained there, *Sutcliffe*, now cited by the government, is inapposite. 505 F.3d 944, 958-959 (9th Cir. 2007). In that case, the government had a higher mens rea to prove, which the Ninth Circuit pointed out in distinguishing cases in other circuits with similar facts where firearms ownership had not been allowed in. *Id*. at 959. Additionally, the defendant claimed that the phrase "I am now armed" meant armed with information. *Id*. There is no such factual contention here—everyone agrees that Mr. Giglio was referencing a weapon in his charged voicemail.

As for the *Kinney* case, the unpublished opinion is devoid of details around what social media evidence showing possession of firearms was allowed in, but the Court found that "Kinney's public postings on social media provided context on how his statements would be viewed both by those he threatened and a reasonable person." *United States v. Kinney*, 2024 WL 3450988, at *2 (9th Cir. 2024). These appear to have been public postings of firearms, distinct from the private evidence of firearm possession the government seeks to introduce here. Mr. Giglio's private firearm possession, unknown to the recipients of the calls, does not provide context for how either the recipients or a reasonable person would view the calls without that knowledge.

### D. Evidence from Mr. Giglio's phone is inadmissible.

The government seeks to introduce "Evidence of Giglio's other acts and statements obtained from his cell phone, including text messages and emails he sent to others, audio recordings, images, and other data files." Dkt. 90 at 1. This constitutes nine pages of evidence from Mr. Giglio's phone, including text messages, emails, and calendar entries. Dkt. 90 Exhibit A. The government does not justify these pieces of evidence independently and instead spends

less than a page describing them as wholesale relevant to Mr. Giglio's "state of mind" and modus operandi.[1] The government argues that previous threats show Mr. Giglio "knew how to communicate a serious intent of unlawful violence." That is not at issue. No one is claiming Mr. Giglio did not "know how" to make a threat. The issue is whether he did in the charged instances. The government seeks to show that he arguably did in other, uncharged cases, and the risk of the jury convicting on the basis of this uncharged conduct is extremely high.

The defense further explained in its motion to exclude why this evidence is inadmissible. Dkt. 85 20-29, 37-41. The government cites *United States v. Justus* to support this voluminous admission. 162 F.4th 962, 968-69 (9th Cir. 2025). In that case, the court allowed 73 exhibits from the defendant's anti-government social media postings to support the government's theory that he had pre-planned the attack with the codefendant he was charged with aiding and abetting. *Id*. at 967. Unlike here, the core facts were directly at issue: the defendant claimed he had no violent intentions on the day of the shooting and was actually threatened by his codefendant, while the government claimed he pre-planned violence and willingly participated. *Id*. Perhaps if Mr. Giglio was arguing he did not make the charged calls, or did so under duress, or was not upset with the government, this case would be more relevant. Again, the government seeks to introduce other bad acts in order to heighten the chance of conviction. Rule 404(b) does not permit this.

All these posts were also found to be temporally relevant by the district court because they were within six months of the shooting. *Id*. The evidence the government seeks to introduce spans more than four years. For example, number 4: the government asks the Court to admit audio of an unrelated family conflict where Mr. Giglio uses violent language against his son nearly three years before being charged in this case. What possible non-propensity purpose is there from this? The government seeks to admit as many other bad acts as possible for the exact purpose that 404(b) prohibits, and the Court cannot allow it. The defense asks that

---

[1] The government has thrown in the ridiculous argument of modus operandi throughout its justifications to admit other bad acts in this case. The defense refers to its previous explanation of why modus operandi did not apply in the context of the Benson calls. Dkt. 85 at 8.

the government actually justify a non-propensity purpose for each piece of evidence at the Pretrial Conference. Between Rules 404(b) and 403 this evidence should not be allowed.

**E. The Reuters article is inadmissible.**

Specifically, the government seeks to introduce:

> Evidence of a Reuters news article published in September 2024, which reported accounts and admissions of Giglio's threatening and harassing conduct and communications.

Dkt. 90 at 1. The defense has explained in its motions in limine why the article should not be admitted. Dkt. 89 at 4-7. It will respond to a few of the government's points here.

The government seeks to avoid the obvious hearsay problem the article presents by claiming it is "largely" not being offered for its truth. Of course it is. The government wants the jury to believe the statements attributed to Mr. Giglio are accurate. That requires a layer of hearsay. *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991). To say it is offered for the effect on the listener, at least as to Mr. Giglio's own alleged statements, makes no sense. The effect on Mr. Giglio of hearing what the reporter asserts he said? That exception does not fit. It also does not justify admitting a highly prejudicial narrative connecting Mr. Giglio to political violence and the conduct of others. The title itself invites the jury to punish Mr. Giglio for other acts: "Trump fan targets MAGA foes with menace—and gets away with it."

Nor did Mr. Giglio adopt the statements attributed to him in the article. Just because there is evidence he knew about the article does not mean he agreed with and adopted everything within it. In fact, the government's own Exhibit A contradicts this claim of wholesale adoption: number 14 says the reporters "came up with this nonsense," number 22 calls the article a "hit piece." Dkt. 90 Ex. A at 3, 7.

The residual exception also does not apply. The government quotes *Larez*'s discussion of trustworthiness but omits its holding: the Ninth Circuit reversed because newspaper quotations were inadmissible where the proponents had not satisfied the residual exception's requirement that the evidence be more probative on the point for which it is offered than any other evidence obtainable through reasonable efforts. *Larez*, 946 F.3d at 644.

Because the article is hearsay, full of other alleged bad acts, and highly prejudicial due to editorial narrative, it cannot be admitted.

## II. Opposition to government's MIL #2.

The government seeks an order prohibiting any evidence of, reference to, or argument concerning Mr. Giglio's stroke or mental condition as it bears on his mental state. That request conflates an insanity defense, expert medical testimony, and ordinary factual testimony concerning a defendant's experiences, behavior, and understanding. The first two categories implicate Federal Rule of Criminal Procedure 12.2. The third does not become inadmissible merely because it bears on an element the government must prove. Mr. Giglio is not asserting an insanity defense or offering an unnoticed medical expert.

As explained in his motions in limine, Dkt. 89, he seeks to present testimony grounded in personal experience and observation. If he elects to testify, he would describe his experiences, changes he perceived in his functioning, and his understanding of his communications. What remains genuinely disputed, the effect Mr. Giglio's stroke on his cognition, is narrow, and it is not a question the defense's lay witnesses will be asked to answer as experts.

The distinction is consequential. Rule 12.2(b) requires notice of "expert evidence" concerning a mental condition bearing on guilt; it does not require notice of every factual observation relevant to mental state. And the government's own authorities reject its proposed categorical approach. In *Crawford v. City of Bakersfield*, 944 F.3d 1070 (9th Cir. 2019), law enforcement officers were sued for excessive force in the shooting of Crawford's son. Crawford sought to introduce her own lay opinion testimony regarding the fact that her son "often talked to himself," said he heard voices, and had previously sought counseling for these issues. *Id*. at 1075. The Ninth Circuit held this testimony should have been admitted, rejecting the defendants' argument that it included improper lay opinion under Rule 701. *Id*. at 1079. The Court explained that "so long as Crawford stopped short of opining that [her son] had a mental illness," she could provide lay witness testimony "about her own observations of [his

past behavior] and experiences with [her son].” *Id*. That is precisely what Mr. Giglio seeks to do here.

The Court should deny the government’s request for blanket exclusion. The Court should also decline to hold that Mr. Giglio cannot reference the fact that he had a stroke, or to admit Dr. Choi’s testimony automatically upon admission of any evidence concerning Mr. Giglio’s condition.

**A. Legal Standard**

There are three basic types of mental health defenses: an insanity defense, a diminished capacity defense, and a mental health defense raised in order to negate mens rea. The insanity defense “is not concerned with the mens rea element of the crime; rather, it operates to completely excuse the defendant whether or not guilt can be proven.” *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988). The diminished capacity defense is “directly concerned with whether the defendant possessed ***the ability*** to attain the culpable state of mind which defines the crime. Successful defendants simply are not guilty of the offense charged.” *Id*. (emphasis added). By contrast, a mental health defense does not argue that the defendant lacked the ability to attain a culpable state of mind—merely that the defendant lacked that state of mind. As the Third Circuit has explained:

> Evidence of mental abnormality is admissible to negate mens rea because it is relevant to the determination of whether the government has established the specific intent element of a crime. In contrast to the diminished capacity or diminished responsibility defense, where the defendant’s argument is that his or her conduct was excused or justified, evidence negating mens rea is admissible because the argument is simply “not guilty.”

*United States v. Wall*, 593 F. Appx. 128, 131 (3d Cir. 2014) (unpub.).

**B. Argument**

**i. Mr. Giglio does not intend to introduce an insanity defense or any expert evidence of a mental condition.**

The government argues that, since the defense did not make the required disclosures under Rule 12.2, Mr. Giglio should not be permitted to present: (1) an insanity defense; (2)

expert testimony of a mental condition, such as the testimony of Dr. Jennifer Goldbeck; or (3) medical records from Dr. Long and Dr. Gideon. Dkt. 91 at 7. Since the defense does not have any intention of introducing evidence or testimony to this effect, this portion of the government's motion should be denied as moot.

However, the government goes on to argue that Mr. Giglio "should be excluded from suggesting or arguing that his stroke or other mental condition (1) negates his intent, knowledge, or other mental state element for the charged offenses, ***or otherwise bears on the issue of guilt.***" Dkt. 91 at 7 (emphasis added). As discussed in more detail below, that argument goes too far.

**ii. The proposed testimony is factual, not an unnoticed insanity or expert defense**

As the defense already explained, the proposed testimony would be carefully limited to ensure it does not veer outside the bounds of what constitutes permissible lay opinion testimony. Specifically, Mr. Giglio would describe his own experiences following his 2016 stroke, including his perception that there have been changes in his memory, conversational skills, emotional reactions, physical functioning, and engagement with politics. Mr. Geffrard would also describe his observations of Mr. Giglio's behavior, language, and communications. Dkt. 89 at 7–8.

The record already establishes the historical fact of the stroke and its observable physical consequences. According to the government, the stroke was a recurring subject of Mr. Giglio's dealings with law enforcement. When an Indian River County deputy visited him on February 27, 2025, four weeks before the first charged call, Mr. Giglio said that he suffers from the effects of a stroke and cannot move around well. Dkt. 91 at 2 (citing GIGLIO-017349). He discussed the stroke at length with a Travis County detective on May 9, 2025; referred to his brain damage in a June 27, 2025 voicemail to an FBI agent; and described the stroke again to agents while being transported after his arrest that day. *Id.* (citing GIGLIO-017369, GIGLIO-000288, GIGLIO-000134). He told another detective that the stroke had left him paralyzed on the right side of his body. *Id.* (citing GIGLIO-000147).

Law enforcement officers without medical training documented the physical consequences, which shows that those consequences are perceptible to laypersons. On April 1, 2025, a U.S. Capitol Police Threat Assessment special agent informed Representative Swalwell's staff, based on the February 27 visit, that Mr. Giglio was living out of a camper, had no operable vehicle, was "suffering from a severe physical impairment," and was largely unable to walk more than 30 feet. Dkt. 89-6 (Ex. E, GIGLIO-017177). The same email told staff that the calls did not meet the threshold to be considered a true threat. *Id.*

Medical corroboration comes from both sides. The defense produced records from Mr. Giglio's primary-care physician describing a 2016 left pontine stroke. Dkt. 91 at 3; Dkt. 83 (under seal). The government does not suggest that Dr. Choi questions whether the stroke occurred; it represents instead that his report explains that a left pontine stroke of this kind "ordinarily results in motor impairment, not cognitive impairment." Dkt. 91 at 4. The government therefore does not dispute that Mr. Giglio had a stroke or that it left him physically impaired. It disputes only whether the stroke affected his cognition, and the defense's lay witnesses will not be asked to resolve that question. To remove any foundational concern about the historical fact, the defense is prepared to accept a stipulation that Mr. Giglio suffered a stroke in 2016, which would also make any testimony about its medical classification unnecessary.

To clarify that proffer, the defense does not seek permission for either witness to attribute particular conduct to damage to a particular brain structure, diagnose a neurocognitive disorder, interpret medical testing, or explain the neurological mechanisms of impulse control or threat perception. Nor does the defense seek to introduce the medical or psychological opinions of Dr. Long or Dr. Gideon through a lay witness. The proposed testimony must instead rest on what the witness personally experienced, saw, or heard.

The government may object to a particular question that exceeds those limits. But its concern about possible improper answers does not justify excluding the underlying factual subjects altogether. The Court can address the foundation for the historical fact of the stroke

separately from the admissibility of observations made before and after it. Likewise, the Court can distinguish testimony about actual experiences from an opinion about their medical cause.

**iii. Rule 12.2 does not require notice for lay mental health testimony.**

The government argues—without any citation—that Rule 12.2 required Mr. Giglio to provide notice of his intent to introduce lay testimony regarding his stroke and other cognitive issues. Dkt. 91 at 12. That is flatly incorrect. Rule 12.2 establishes two distinct notice obligations: Subsection (a) requires that a defendant provide notice of his intent to assert an affirmative defense of insanity. *See* Fed. R. Crim. P. 12.2(a). Subsection (b) requires notice when a defendant intends to introduce "***expert*** evidence relating to a mental disease or defect or any other mental condition" bearing on guilt. *See* Fed. R. Crim. P. 12.2(b). Failure to provide the required notice or submit to an ordered examination may result in the exclusion of the defendant's "expert evidence." Fed. R. Crim. P. 12.2(d)(1).

The government's argument that the defense is required to provide notice of *any* testimony suggesting that a condition "affected" Mr. Giglio's intent, knowledge, or awareness cannot be squared with the text of Rule 12.2(b). First, this reading of the Rule effectively omits the word "expert" from subsection (b). Dkt. 91 at 7–8. Second, the penalty the Rule imposes for failure to abide by the notice requirement is the exclusion of unnoticed "expert" evidence. Fed. R. Crim. P. 12.2(d)(1). That would make little sense if the Rule were also intended to encompass unnoticed lay testimony on mental state. Thus, the government's argument seeking to exclude the challenged evidence for failure to give notice under Rule 12.2 fails.

**iv. Contrary to the government's argument, it is well established that lay testimony on mental health issues is admissible within limitations.**

The government next argues that "lay evidence of a stroke cannot properly reach the jury on the question of mens rea without expert evidence to fill the gaps." Dkt. 91 at 9. That is wrong, as the government's own authorities show.

The Ninth Circuit's decision in *Crawford* illustrates why. 944 F.3d 1070 (9th Cir. 2019). In that case, law enforcement officers were sued for excessive force in the shooting of Crawford's son. Crawford sought to introduce her own lay opinion testimony regarding the fact

that her son "often talked to himself," said he heard voices, and had previously sought counseling for these issues. *Id*. at 1075. The Ninth Circuit held this testimony should have been admitted, rejecting the defendants' argument that it included improper lay opinion under Rule 701. *Id*. at 1079. The Court explained that "so long as Crawford stopped short of opining that [her son] had a mental illness," she could provide lay witness testimony "about her own observations of [his past behavior] and experiences with [her son]." *Id.*

That is exactly what Mr. Giglio seeks to do here. To reiterate, the defense does not plan to introduce any testimony that Mr. Giglio "lacked the capacity to form the required intent." Dkt. 91 at 9. Rather, Mr. Giglio would describe his own experiences following his 2016 stroke, including his perception that there have been changes in his memory, conversational skills, emotional reactions, physical functioning, and engagement with politics. Mr. Geffrard would also describe his observations of Mr. Giglio's behavior, language, and communications. Dkt. 89 at 7–8.

There is ample evidence that supports (1) the historical fact of the stroke and (2) the fact that the stroke had physical consequences that laypersons can observe. Starting with the first point, the defense produced records from Mr. Giglio's primary-care physician describing a 2016 left pontine stroke. Dkt. 91 at 3; Dkt. 83 (under seal). The government does not dispute that Mr. Giglio in fact suffered a stroke. Dkt. 91 at 4. The stroke has been a recurring subject of Mr. Giglio's dealings with law enforcement. When an Indian River County deputy visited him on February 27, 2025, four weeks before the first charged call, Mr. Giglio said that he suffers from the effects of a stroke and cannot move around well. Dkt. 91 at 2 (citing GIGLIO-017349). He discussed the stroke at length with a Travis County detective on May 9, 2025; referred to his brain damage in a June 27, 2025 voicemail to an FBI agent; and described the stroke again to agents while being transported after his arrest that day. *Id.* (citing GIGLIO-017369, GIGLIO-000288, GIGLIO-000134).

Second, even law enforcement officers without medical training could easily see the physical consequences of Mr. Giglio's stroke, which shows that those consequences are perceptible to laypersons. For instance, on April 1, 2025, a U.S. Capitol Police Threat

Assessment special agent informed Representative Swalwell's staff that Mr. Giglio was "suffering from a severe physical impairment," and was largely unable to walk more than 30 feet. Dkt. 89-6 (Ex. E, GIGLIO-017177). The deputies and detectives who recorded Mr. Giglio's limited mobility and right-side paralysis did not diagnose anything; they described what they saw and heard. Dkt. 91 at 2; Dkt. 89-6. Mr. Geffrard's observations of Mr. Giglio's speech, behavior, and physical functioning are no different in kind. Nor is Mr. Giglio's own account of what he experiences, which rests on personal knowledge under Rule 602 rather than on specialized knowledge under Rule 702.

At bottom, the government takes issue with the idea that the stroke affected Mr. Giglio's cognition. But the defense's lay witnesses will not be asked to resolve that question, which would require specialized knowledge and run afoul of Rule 701. However, the defense is entitled to present lay witness testimony regarding observable impairments in Mr. Giglio's physical functioning and cognition. *Crawford* establishes that lay witness testimony about "observations of [past behavior]" and "experiences with [the defendant]" is admissible, and the government cannot show otherwise. *Id*. at 1079.

Undeterred, the government argues that lay witness testimony on Mr. Giglio's stroke cannot be admitted without accompanying expert testimony. The government asserts that, under *United States v. Christian*, 749 F.3d 806, 815 (9th Cir. 2014) and *United States v. Twine*, 853 F.22 676 (9th Cir. 1988), the connection between a condition and capacity to form intent must be "supplied by noticed expert testimony." Dkt. 91 at 9. That is wrong on two counts.

First, again, the defense does not claim Mr. Giglio lacked the capacity to form the specific intent to threaten. That is why Mr. Giglio is raising a mental health defense, not a diminished capacity defense, which was the issue in both *Twine* and *Christian*. *Christian*, 749 F.3d at 810; *Twine*, 853 F.22 at 678. Thus, those cases are of limited utility in this context.

Regardless, neither *Christian* nor *Twine* announced a categorical rule that lay opinion testimony on mental state must always be accompanied by expert testimony. To the contrary, the Court in *Christian* explained:

"If ***any evidence***, expert or otherwise, supporting a link between Christian's mental illness and his ability to form the intent to threaten is presented during the new trial, the district court must give the jury a diminished capacity instruction."

749 F.3d at 815 (emphasis added). It is also telling that, in *Crawford*, the Ninth Circuit held that the plaintiff should have been permitted to introduce lay opinion testimony regarding Crawford's son's mental illness, even though plaintiff did not also present expert testimony on that point. *See* 944 F.3d at 1079-80 (holding that exclusion of lay opinion testimony was prejudicial because it was the only proffered evidence regarding Crawford's son's mental illness).

Iin sum, a witness may describe an observed change in conversation, memory, or emotional reaction without diagnosing its neurological cause. Mr. Giglio may describe his own experiences and, if he testifies, what he understood or intended when communicating, without offering a medical opinion about the functioning of his brain. The Court can evaluate the relevance, foundation, and permissible scope of those subjects without imposing a blanket prohibition.

**v. The testimony the government seeks to exclude is relevant, and it is not more prejudicial than probative.**

The government argues that "lay evidence of the stroke has no legitimate probative value on any element." Dkt. 91 at 9-10. That is wrong.

First, evidence of the physical impairments caused by Mr. Giglio's stroke is relevant to the objective true threat component. The government claims that because a true threat does not require that the speaker intend or be able to carry it out, evidence of physical incapacity is irrelevant. Dkt. 91 at 10. That does not follow. The jury's task is to decide whether a reasonable person, considering the full factual context, would understand the statement as a serious expression of intent to commit unlawful violence. *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023); *United States v. Bagdasarian*, 652 F.3d 1113, 1122 (9th Cir. 2011). What the listener knew about the speaker is part of that context. *See United States v. Acosta-Sierra*,

690 F.3d 1111, 1121 (9th Cir. 2012); Dkt. 89 at 1–2. If A threatens to kick B, but B knows A is in a wheelchair, that impairment is absolutely relevant context to how a reasonable person would interpret that threat.

The same is true here. The Capitol Police email informed congressional office staff that Mr. Giglio lived across the country in a camper, had no operable vehicle, and could barely walk. Dkt. 89 at 10–11; Dkt. 89-6. A reasonable listener in that office would weigh those facts in deciding whether the June call, which was made 10 weeks later, was a serious expression of intent to commit violence.

Moreover, since evidence that Mr. Giglio could barely walk and had paralysis is not unfairly prejudicial to the government, there is no basis to exclude this evidence.

Second, evidence of the mental impairments caused by Mr. Giglio's stroke is relevant to his mental state. Under *Counterman*, the government must prove that Mr. Giglio appreciated the risk that the recipients of his message would understand it to be a threat. Evidence that Mr. Giglio often behaves impulsively after his stroke, or that he struggles to predict how people will react to his actions, has direct bearing on this question.

Importantly, the standard for evidence to be relevant is low: it is enough for the evidence to have "any tendency to make a fact [of consequence] more or less probable" than it otherwise would be. Fed. R. Evid. 401(a). The government's argument is essentially that the defense's proposed lay opinion testimony is not sufficient to show Mr. Giglio lacked the required mens rea in the absence of expert testimony. The government is free to make that argument at trial, but that does not make the proposed evidence irrelevant.

Next, the government argues evidence of the mental impairments caused by Mr. Giglio's stroke must be excluded because it is substantially more prejudicial than probative. The government claims the evidence is "affirmatively misleading, in light of the information from Dr. Choi's preliminary report." Dkt. 91 at 10. But the admissibility and proper scope of Dr. Choi's opinions are themselves disputed. And in fact, Dr. Choi's report acknowledges that it is plausible that Mr. Giglio's stroke, coupled with frontal lobe damage due to his

concussions, could impair "impulse control, executive function, and cognition." Supp. Notice at 6. Thus, the proposed lay opinion testimony can hardly be called misleading.

Nor will the evidence cause unfair prejudice. The government claims that, without expert testimony, the jury will simply have to "speculate that a brain injury must have affected Giglio's mental state." *Id*. at 10. But if the proposed lay testimony is admitted, surely the government will point out its limitations. *See Crawford*, 944 F.3d at 1080 ("Defendants could still have suggested in closing that if Dozer had truly been mentally ill, 'you would have seen a medical doctor, a psychiatrist, a psychologist come in and tell you that they've either diagnosed Mr. Dozer or that there was evidence of that.'"). The jury will then have to consider the lay testimony for what it is worth. In essence, the government's argument goes to weight rather than admissibility. And it does not demonstrate unfair prejudice—particularly since *Crawford* held it was error to exclude lay testimony that was similarly introduced without accompanying expert testimony. *Id*. at 1079.

Finally, the sympathy concerns raised in the government's footnote are misplaced. Dkt. 91 at 10 n.2. The defense does not intend to argue that Mr. Giglio's health makes a conviction or sentence unfair, which would be improper.

**vi. The government's proposed redactions must be rejected, as they violate the Rule of Completeness.**

The government states that, if its motion is granted, it intends to redact stroke references from Mr. Giglio's statements offered in its case-in-chief. (As noted above, Mr. Giglio repeatedly mentioned his stroke during his encounters with law enforcement.) That request should be denied.

Current Rule 106 provides that, when a party introduces all or part of a statement, the opposing party may require contemporaneous introduction of another portion or statement that fairness requires. It expressly permits the introduction of this evidence "over a hearsay objection." Fed. R. Evid. 106. The rule of completeness is critical to prevent precisely the type of selective presentation of evidence the government seeks to engage in here.

The stroke is not an incidental aside in Mr. Giglio's statements. The government's own catalog shows that he raised it repeatedly in the very encounters the government may seek to introduce. Dkt. 91 at 2. In the June 27, 2025, voicemail to an FBI agent, for example, his reference to brain damage is the premise of the passage the government quotes, not a detachable clause. *Id.* (quoting GIGLIO-000288). Likewise, if the Court admits evidence that Mr. Giglio was warned during the February 27, 2025, deputy visit, which the government may offer to show his awareness of how his calls were perceived, the same encounter included his statement that he suffers from the effects of a stroke and cannot move around well. Presenting the warning while excising the context in which it was given is the kind of selective presentation the amended rule addresses.

The government also invokes *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000), to characterize Mr. Giglio's own favorable statements as inadmissible hearsay. Dkt. 91 at 10. *Ortega* concerns the party-opponent exception to hearsay. However, that is not the only grounds to admit Mr. Giglio's statements. As noted, the rule of completeness allows admission even over a hearsay objection. And regardless, Mr. Giglio's statements describing his then-existing physical and mental condition fall within Rule 803(3).

**vii. A proffer is unnecessary, and the admission of lay opinion testimony does not automatically establish the admissibility of Dr. Choi's opinions.**

The government requests that the defense be required to make a proffer before making any reference to Mr. Giglio's stroke. Through its original motion in limine and its response to this opposition, the defense has already indicated the type of evidence it will seek to introduce regarding the stroke. An additional proffer is not necessary. The defense will abide by whatever rulings and limitations the Court imposes at trial.

Mr. Giglio respectfully requests that the Court deny Government MIL No. 2 to that extent it seeks categorical exclusion of stroke history, firsthand experiences, observed behavior, physical limitations known to the listener, and relevant statement context.

## III. Opposition to government MIL #3.

The government seeks to exclude all law enforcement opinions about whether Mr. Giglio's communications were true threats. Dkt. 92. The defense intends to offer one single law enforcement communication for a non-hearsay purpose. On April 1, 2025, USCP Special Agent Walter Ramirez wrote to Congressman Swalwell's Strategic Advisor on the Constitution and Law Enforcement (the "LEA"), the staff member who had reviewed and reported the March 27 voicemails. The email said that "the content of these calls do not meet the threshold to be considered a true threat, but are concerning, none the less." Dkt. 92 at 2. This statement is relevant and admissible.

**A. This statement is not hearsay.**

Most of the government's arguments assume this statement would be offered for its truth. Not so. The defense offers this email for its effect on the recipients. It shows that the district office had additional information about Mr. Giglio when it received his June 13 call—information that would impact how a reasonable listener would interpret that communication. By the time of the June 13 call, the recipients had been told by USCP: (1) that Mr. Giglio was located in Florida, on the opposite side of the country; (2) that Mr. Giglio was physically impaired and largely unable to walk more than 30 feet; (3) that Mr. Giglio's voicemails were mot deemed true threats by USCP; and (4) that USCP had not found it necessary to take further action. Regardless of whether USCP's assessment was correct, it is relevant to the effect on the recipients of the communication.

"An out-of-court statement is not hearsay if offered for any purpose other than the truth of whatever the statement asserts," including the effect on the listener. *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019) (citing *Payne*, 944 F.2d at 1472). In *Payne*, the Ninth Circuit approved admission of a statement that the defendant had abused the victim. The statement was not offered for its truth but "to show the effect on the listener . . . and to explain the circumstances under which" she later acted. 944 F.2d at 1472. The statement in *Payne* also involved the ultimate issue in the case, which did not make it inadmissible.

Admission for this limited purpose does not run afoul of *United States v. Hanna*, 293 F.3d 1080 (9th Cir. 2002). The government's own motion notes that the true threat inquiry

focuses on "those to whom the maker communicates," and that the "reaction of the listeners" and intended recipients is "directly relevant." Dkt. 92 at 1, 4 (citing *Hanna*, 293 F.3d at 1086, and *United States v. Mitchell*, 812 F.2d 1250, 1255 (9th Cir. 1987)). The government plans to call those recipients to describe their reactions and their reports to law enforcement. Dkt. 92 at 7. The defense is entitled to show the jury what those same recipients were told when they made those reports, and how that information could affect a reasonable listener's interpretation of the June call. The government seeks to introduce numerous law enforcement statements (to Mr. Giglio) for their effect on the listener.[2] It cannot then turn around and say the defense should not be able to do so in a single instance.

**B. This statement is not an improper conclusion on an ultimate issue of law.**

Just as this evidence is not offered for the truth, it is also not offered as a conclusion on an ultimate issue of law. The cases the government cites do not deal with an out of court statement offered for its effect on the listener, but rather, expert opinion testimony offering a legal conclusion to the jury. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Even in *Hanna*, law enforcement testimony was treated by the district court as expert testimony and offered legal conclusions on whether the defendant's statements were threatening. This in-court testimony offering legal conclusions to the jury is totally dissimilar from what the defense seeks to admit: an out of court statement that was communicated to the recipients of the communications before they received one of the charged communications. *Hanna*, 293 F.3d at 1085-86.

**C. This evidence is not barred by Rule 403.**

The government claims that Rule 403 requires exclusion but is unclear as to the basis for that. Dkt. 93 at 6. "[T]he exclusion of evidence offered by the defendant in a criminal prosecution under Rule 403 is 'an extraordinary remedy to be used sparingly.'" *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015) (quoting *United States v. Mende*, 43 F.3d 1298,

---

[2] The defense objects to the admission of those conversations on other grounds, including Rule 404(b) and 403.

1302 (9th Cir. 1995)). For the evidence to be excluded under the Rule, its unfair prejudice would need to substantially outweigh its probative value. That is not the case here. The statement is relevant to what the office knew about Mr. Giglio at the time of his second call. The fact that USCP, charged with protecting the congressman, had deemed his communications not true threats goes directly to the context of the second call and how a reasonable person would interpret it. And the risk of unfair prejudice is low: the jury can be given a limiting instruction to only consider the statement for its effect on the listener and the context of the second phone call. The defendant also has a due process right to present his version of the facts. *See id.* at 1281; *United States v. Evans*, 728 F.3d 953, 959 (9th Cir. 2013).

**IV. Opposition to government's MIL #4.**

The government seeks to introduce a handwritten note dated June 13, 2025, produced at Bates number GIGLIO-008454, that was written by Brittany Robles-Camacho. Dkt. 93 at 1. Mr. Giglio does not dispute that the note is relevant or that the government can authenticate it at trial. However, the government's primary argument for admissibility is that the contents of the note fall within the present sense impression to the hearsay rule. *Id*. at 2. The government claims this is so because "Camacho contemporaneously wrote down what the caller was saying as the June 13, 2025 call was taking place." *Id*. If that is the case, Mr. Giglio agrees the note (with the government's proposed redactions) would fall within the present sense exception. However, the government must first establish a foundation for this claim through Camacho's testimony at trial. Rather than rule the note admissible at this time, this Court should defer its ruling on admissibility until the government has laid an adequate foundation.

The same holds true for the government's alternative argument that the note may be admitted as a recorded recollection under Rule 803(5). The government will first need to establish a foundation demonstrating that the requirements of the rule are met, including that the note "was made or adopted by the witness when the matter was fresh in the witness's memory." Fed. R. Evid. 803(5)(B). Moreover, even if those requirements are met, the note may not be received as an exhibit. Rather, the record may only "be read into evidence." *Id.*

**V. Opposition to government's MIL #5.**

The defense will not argue for jury nullification, and certainly has no plans to argue that Mr. Swalwell "deserved" to be threatened, to the extent that now needs to be said. Nor will the defense argue that Mr. Giglio should not be convicted because incarceration will be too hard on his health, though the government cannot preclude the defense from introducing relevant evidence of his stroke at all, *see* Dkt. 89 at 7-8. However, the government seeks to control defense argument beyond appropriate or permissible bounds.

The government asks the Court to bar the defense from making any reference to punishment or jury nullification at any stage of the trial. Dkt. 94. The government has cited no authority for imposing an absolute, unilateral ban on references to punishment. *See, e.g., Shannon v. United States*, 512 U.S. 573, 586-87 (1994) (holding that although courts are not required to, and generally need not, instruct juries about consequences of verdict of not guilty by reason of insanity, instruction may be necessary in some circumstances); *cf. United States v. Johnson*, 62 F.3d 849, 851 (6th Cir. 1995) (instruction about punishment not necessary because government did not mislead jury about seriousness of offense). Although information about the consequences of a jury's verdict generally is irrelevant to its task of determining whether a defendant is guilty of the charged offenses, *Shannon*, 512 U.S. at 579, the government's proposed ban on defense references to punishment sweeps too broadly. There may be circumstances in which it would be relevant for a jury to know about potential penalties, for instance, to support a defense argument about a witnesses' motivations and biases.

Importantly, barring the defense from arguing about the seriousness of the jury's decision and that the jury's decision will affect Mr. Giglio's liberty infringes on his Fifth Amendment rights. *See United States v. Velazquez*, 1 F.4th 1132, 1137 (9th Cir. 2021) (prosecutor engaged in misconduct, in violation of Fifth Amendment, by trivializing the reasonable doubt standard by comparing it to making decisions like going for a drive or eating a meal). The defense is entitled to impress upon the jury the seriousness of its decision and the reason that the standard of proof in a criminal trial is so high. *See id*. (the standard of proof protects defendants from unjustifiable loss of liberty).

Any limitation the Court puts on references to punishment at trial should encompass the government as well as the defense. *See Evalt v. United States*, 359 F.2d 534, 546 (9th Cir. 1966) (reversing conviction where government but not defendant was allowed to argue effect of not-guilty by-reason-of-insanity verdict). "The court should [impose] upon the prosecutor the same restriction as to the effect of a verdict of not guilty as it impose[s] upon the defense." *Id*. The government should not be permitted to argue or imply that Mr. Giglio is a danger to society, for example, or that the jury needs to ensure that he is punished for breaking the law. *Id*. (government may not invite jury to convict defendant, for society's protection, even though it might have believed defendant not guilty by reason of insanity); *see also United States v. Birrell*, 421 F.2d 665, 666 (9th Cir. 1970) (same).

## VI. Opposition to government's MIL #6.

Although the title for the government's Motion in Limine No. 6 claims only that a "[g]ood faith basis" should be required before allowing the Defendant to make any *Henthorn* inquiry," Dkt. 95 at 1, the government's actual request is much broader. Specifically, it asks the Court to require the defense "to make an offer of proof and relevance regarding any alleged misconduct by law enforcement officers outside the presence of the jury before inquiring about such alleged misconduct during trial." *Id.* at 2. The government offers no authority that requires or even allows the Court to impose such a requirement, and particularly to impose such a requirement on only one party and for only one type of witness. The defense understands and will abide by its ethical obligations, including those requiring a good-faith basis for cross-examination questions, as well as the Federal Rules of Evidence. The Court should deny the government's motion in limine.

## VII. CONCLUSION

For the aforementioned reasons, Mr. Giglio respectfully requests the Court deny the government's motions *in limine*.

Respectfully submitted,

November 10, 2026
Dated

JODI LINKER
Federal Public Defender
Northern District of California

/S

TAYLOR R. FATHERREE
CANDIS L. MITCHELL
LISSET M. PINO
Attorneys for Geoffrey Giglio