CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ANNE C. HSIEH (CABN 288159)
AMANI S. FLOYD (CABN 301506)
Assistant United States Attorneys

60 South Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 535-5596
FAX: (408) 535-5066
Anne.Hsieh@usdoj.gov
Amani.Floyd@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GEOFFREY CHAD GIGLIO,<br><br>Defendant. | Case No. 3:25-CR-00264-VC<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE NOS. 1 TO 17 (DKT. NO. 89)**<br><br>Hearing Date: November 17, 2026<br>Hearing Time: 10:00 a.m.<br>Courtroom: 3, 17th Floor<br><br>Hon. Vince Chhabria |

# TABLE OF CONTENTS


I. Response to Defense MIL No. 1: The Court Should Not Exclude Evidence that Giglio Sold the Firearm He References in His Charged Threat Months After He Made the Charged Threat ..... 1

II. Response to Defense MIL No. 2: The Court Should Admit Evidence of the First Voicemail that Giglio Sent on or about March 27, 2025 Because It is Direct Evidence of and Inextricably Intertwined with the Charged Offenses ..... 3

III. Response to Defense MIL No. 3: The Court Should Admit the Reuters News Article ..... 4

IV. Response to Defense MIL No. 4: The Court Should Exclude or Limit Lay Witness Testimony on Giglio's Stroke and Mental Conditions, and Permit Testimony from the Government's Expert to Address Giglio's Claims ..... 7

V. Response to Defense MIL No. 5: The Court Should Only Allow Argument on the "Speech Integral to Conduct" Exception If It Requires the Jury to Make a Factual Finding on that Point ..... 10

VI. Response to Defense MIL No. 6: The Court Should Permit Witness Testimony on "Listener Reaction," Including Emotional Impact, Because It Is Directly Relevant to the Charged Threats ..... 12

VII. Response to Defense MIL No. 7: The Court Should Exclude USCP's Law Enforcement Opinions on Whether Giglio Made a "True Threat" ..... 13

VIII. Response to Defense MIL No. 8: The Court Should Admit Evidence of the USCP "Facesheet" Because It is Directly Relevant to the Charged Offenses ..... 14

IX. Response to Defense MIL No. 9: The Court Can Deny the Motion as Moot Because the Government Does Not Intend to Introduce Giglio's Prior Convictions and Arrests ..... 16

X. Response to Defense MIL No. 10: The Court Should Require Clarification from Defense Before Ruling on this Motion to Exclude "Guilt-Assuming Hypotheticals" ..... 17

XI. Response to Defense MIL No. 11: The Court Need Not Exclude References to the Terms "threats," "threatening," and "victim" ..... 17

XII. Response to Defense MIL No. 12: The Court Should Not Order Redaction of Giglio's Communications ..... 18

XIII. Response to Defense MIL No. 13: The Government Does Not Object to a Reading of a Statement Summarizing the Charges in Lieu of Providing the Information to the Jury ..... 20

XIV. Response to Defense MIL No. 14: The Court Should Require Defense to Subpoena its Own Witnesses ..... 20

XV. Response to Defense MIL No. 15: The Court Should Issue a Sequestration Order Consistent with Rule 615(a), Which Permits the Government's Designated Case Agent ..... 20

XVI. Response to Defense MIL No. 16: The Court Should Not Designate the Defense Investigator as a "Case Agent," But May Permit Her to Hear Testimony After She Testifies ..... 21

XVII. Response to Defense MIL No. 17: The Court Should Defer Ruling on This Motion as It Is Currently Inapplicable ....22

IV. CONCLUSION ....23

# TABLE OF AUTHORITIES

*Brady v. Maryland*,
373 U.S. 83 (1963) ..... 22

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ..... 10

*Counterman v. Colorado*,
600 U.S. 66 (2023) ..... 2, 7

*Giglio v. United States*,
405 U.S. 150 (1972) ..... 22

*Larez v. City of L.A.*,
946 F.2d 630 (9th Cir. 1991) ..... 5, 6

*McGinest v. GTE Serv. Corp.*,
360 F.3d 1103 (9th Cir. 2004) ..... 19

*Old Chief v. United States*,
519 U.S. 172 (1997) ..... 4, 16

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
290 F.3d 1058, 1076 (9th Cir. 2002) ..... 2, 19

*United States v. Acosta-Sierra*,
690 F.3d 1111 (9th Cir. 2012) ..... 4

*United States v. Anten*,
184 F.4th 1115 (9th Cir. 2026) ..... 12, 15, 17

*United States v. Broderick*,
No. 24-5919, 2026 WL 1182177 (9th Cir. Apr. 30, 2026) ..... 9

*United States v. Christian*,
749 F.3d 806 (9th Cir. 2014) ..... 9

*United States v. Hankey*,
203 F.3d 1160 (9th Cir. 2000) ..... 4, 19

*United States v. Hanna*,
293 F.3d 1080 (9th Cir. 2002) ..... 12, 15

*United States v. Little*,
753 F.2d 1420 (9th Cir. 1984) ..... 20, 21

*United States v. Mitchell*,
812 F.2d 1250 (9th Cir. 1987) ..... 4, 12, 14

*United States v. Ortega*,
203 F.3d 675 (9th Cir. 2000) ..... 9

*United States v. Osinger*,
753 F.3d 939 (9th Cir. 2014) .......... 10

*United States v. Shwayder*,
312 F.3d 1109 (9th Cir. 2002) .......... 17

*United States v. Sutcliffe*,
505 F.3d 944 (9th Cir. 2007) .......... 2, 3

*United States v. Thomas*,
835 F.2d 219 (9th Cir. 1987) .......... 21

*United States v. Valencia-Riascos*,
696 F.3d 938 (9th Cir. 2012) .......... 20, 21

*United States v. Vizcarra-Martinez*,
66 F.3d 1006 (9th Cir. 1995) .......... 3

*United States v. Waggy*,
936 F.3d 1014 (9th Cir. 2019) .......... 10

*United States v. Winn*,
577 F.2d 86 (9th Cir. 1978) .......... 8

*Virginia v. Black*,
538 U.S. 343 (2003) .......... 14

The United States hereby responds to Defendant Geoffrey Chad Giglio's Motions *in Limine* (Nos. 1 to 17) (Dkt. 89). Because some of the subject matter of Giglio's Motions *in Limine* largely overlap with the United States' Motions *in Limine* (Dkts. 90–95), the government incorporates by reference its motions where appropriate, as specifically discussed below.

## I. Response to Defense MIL No. 1: The Court Should Not Exclude Evidence that Giglio Sold the Firearm He References in His Charged Threat Months After He Made the Charged Threat

Giglio moves to exclude text messages, exchanged between February 2024 and June 2025, between himself and a contact saved in Giglio's phone as "DHS Agent Smith,"[1] regarding the sale of Giglio's firearms. Dkt. 89 at 2–3. According to Giglio, this evidence should be excluded because it is irrelevant. He is wrong on both fronts.

First, the government provided sufficient timely notice under Rule 404(b). To the extent these messages constitute evidence of "other acts," both the government's Rule 404(b) notices and its Rule 404(b) motion (Dkt. 90), expressly informed Giglio that it was offering "[e]vidence of, and relating to, Giglio's purchase, ownership, and/or possession of firearms, including a .308 firearm, and other weapons, before, during, and after the charged offenses," and "[e]vidence of other acts and statements from Giglio's Apple iPhone," including "his statements to others both discussing his plan to sell his .308 (after the charged March 2025 incident) and confirming his sale of the .308 in June 2025." *See* Dkt. 86-1 at 4; Dkt. 90 at 1, 11. More fundamentally however, this is not "other act" evidence at all. Rather, it is direct evidence of the charged offenses, because it proves that the weapon Giglio referenced in the March 2025 charged threat was real and in his possession when he made the threat. Dkt. 90 at 11–12. The government will address Giglio's notice and timeliness arguments more fully in its opposition to Dkt. 85.

Second, as discussed in the government's First Motion *in Limine* (Dkt. 90), evidence of Giglio's

---

[1] In his Motion *in Limine* No. 1, Giglio erroneously describes this contact as a "case agent." Dkt. 89 at 2. He is not. This contact of Giglio's, who he labeled in his phone as "DHS Agent Smith" and with whom he exchanged several personal/non-professional text communications, is neither a member of the investigative team nor a government witness. His identity is entirely irrelevant at trial except as the individual who purchased a weapon from Giglio. These messages will be offered for a single purpose: to show that Giglio possessed the .308 rifle that he invoked in the March 2025 voicemail underlying Counts One through Three at the time he sent that voicemail, then sold it several months later. To avoid any suggestion that law enforcement was involved in the sale, the government will refer to the contact before the jury as "Smith" and will redact "DHS Agent" from the exhibit.

firearm possession—and his possession of this .308 rifle in particular—is directly relevant to the charged offenses. Specifically, the firearms evidence bears on several *mens rea* elements that the government must prove beyond a reasonable doubt. This includes the subjective element of a true threat, which the government may satisfy by showing that the defendant intended, knew, or at a minimum, "consciously disregarded a substantial risk," "that his communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). Furthermore, for Counts One and Four, the government must prove that he threatened to assault or murder Congressman Swalwell with the intent to impede, intimidate, interfere with, or to retaliate against, Congressman Swalwell. 18 U.S.C. § 115(a)(1)(B). Proof that Giglio actually owned the .308 rifle that he invokes in his charged threat (wherein he expresses his intent to "just set up behind my .308 and . . . do my job," and to "lay in wait for days on end") tends to show that his reference to a specific weapon, and his expressed intent to use it to commit violence, was not merely fanciful. This bears directly on whether Giglio, who knew he still had that rifle, intended his words to be taken as a serious expression of the intent to commit violence, or at the very least, was aware of the substantial risk that his words would be received that way. That Giglio sold the rifle months after the charged call does not diminish the evidence's probative value, as proof of the sale in June 2025 confirms that he still possessed the weapon when he invoked it in March 2025, prior to its sale.

As the Ninth Circuit has found, evidence of a defendant's possession of firearms may be relevant in a threats prosecution for its tendency to prove the defendant's "specific intent to threaten." *United States v. Sutcliffe*, 505 F.3d 944, 959 (9th Cir. 2007); *see* Dkt. 90 at 11–12. It does not matter, as Giglio argues, that a true threat does not require that the defendant "intend[ed] to, or [was] able to carry out his threat." Dkt. 89 at 3 (quoting *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1076 (9th Cir. 2002) (en banc)). That principle defines only what the government need not ultimately prove; it does not limit the government from offering evidence that is relevant to proving what it must. Here, even if the government need not prove that Giglio actually intended to carry out his threat, evidence tending to show he had such intent is still probative to show that he possessed the lesser *mens rea* required here—i.e., the intent for his words to be taken as a serious threat, or the knowledge and awareness that they would.

In any event, any risk of unfair prejudice is minimal. The messages at issue concern the sale of a firearm that Giglio legally owned, and the government will offer only what is necessary to show that Giglio sold the .308 in June 2025, and thus still possessed the weapon at the time of his March 2025 call. Any residual concern can be addressed with a limiting instruction. *See United States v. Sutcliffe*, 505 F.3d 944, 959 (9th Cir. 2007).

**II. Response to Defense MIL No. 2: The Court Should Admit Evidence of the First Voicemail that Giglio Sent on or about March 27, 2025 Because It is Direct Evidence of and Inextricably Intertwined with the Charged Offenses**

The Court should deny Giglio's motion to exclude the first of the two voicemails that Giglio left for Congressman Swalwell's district office on or about March 27, 2025, and to redact the conclusion of the second, charged voicemail. Dkt. 89 at 3–4.

The first voicemail is highly probative as direct evidence of the charged conduct in March 2025. It is not "other act" evidence, but part of the same transaction as the charged voicemail. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995) (evidence is inextricably intertwined where "it constitutes a part of the transaction that serves as the basis for the criminal charge"); Dkt. 90 at 3–4. Giglio left both messages for the same office, from the same phone, on the same day, just minutes apart. Based on the AT&T call records, the first call was made at 3:08:16 p.m. PT and lasted for 2 minutes and 24 seconds, while the second call was made at 3:11:13 p.m. PT and lasted for 2 minutes and 2 seconds. Only 33 seconds elapsed between the end of the first call and the start of the second. Indeed, the second message seems to pick up where the first left off, and both use similar taunts and insults, *compare, e.g.,* Dkt. 38 at 4 (language from first call: "You fucking fag," "You like to fuck hot chicks," "But you're such a geek," "You're still that lispy little boy inside," "You'd shit your pants in front of me faggot") *with* Dkt. 38 at 4 (language from second call: "a little faggot like you talking about, oh you only fuck hot chicks? Dude, you're a fucking faggot. You're a geek. You're a little lisper…. You're a silly little faggot."), before escalating into threatening language on "here's what's going to happen," such as, "we will come get you," "[t]here will be the war that you want," and "I'll just set up behind my .308 and I'll do my job." As such, the language of the first voicemail provides important context for the jury's assessment of the second.

Perhaps more importantly, Congressman Swalwell's staff received, reviewed, reacted to, and

reported the two voicemails together, and will testify as such at trial. The first voicemail is therefore essential to a coherent narrative of the government's case-in-chief for charged conduct in Counts One, Two, and Three. In fact, Giglio's own motion confirms the first voicemail's relevance in highlighting that the objective inquiry considers the reasonable person "who observes what the official observes," or "in this case, hears what the listener hears." Dkt. 89 at 2 (quoting *United States v. Acosta-Sierra*, 690 F.3d 1111, 1121 (9th Cir. 2012)). What the listeners heard on March 27 was both voicemails, one after the other. Whether a statement is a true threat "must be determined in light of the entire factual context of the defendant's statements," including "the surrounding events." *United States v. Mitchell*, 812 F.2d 1250, 1255 (9th Cir. 1987). The first voicemail is a critical part of that factual context that the jury must consider, and excluding it would present the jury with an artificially truncated version of what the recipients actually heard. The first voicemail is likewise relevant to Giglio's state of mind: the escalation from personal insults in the first message to a threat to "set up behind my .308" in the second bears on whether he acted with the intent to intimidate and with awareness that his words would be received as threatening.

The request to redact the conclusion of the charged voicemail fails for the same reasons. That passage is part of the charged communication itself. The jury cannot fairly evaluate whether Giglio communicated a threat without hearing what Giglio said in the same breath. The prosecution "is entitled to prove its case by evidence of its own choice," *Old Chief v. United States*, 519 U.S. 172, 186 (1997), and it should not be required to present a charged communication with portions excised.

Nor is the evidence unfairly prejudicial. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (citation omitted). The language in the first voicemail is no more inflammatory than the language in the charged voicemail, which the jury will hear regardless. As discussed in Section XII below, Giglio's hostile language is probative of the meaning and seriousness of his words and of his animus toward Congressman Swalwell, and any risk that the jury will decide the case on an improper basis can be addressed with a limiting instruction.

## III. Response to Defense MIL No. 3: The Court Should Admit the Reuters News Article

The admissibility of the September 19, 2024 Reuters article is addressed in the government's First

Motion *in Limine*, which the government incorporates here. Dkt. 90 at 12–16. As explained there, the article is offered primarily for non-hearsay purposes: to show its effect on Giglio, who was interviewed for it, read it, and discussed it with law enforcement. Giglio's own statements reported in the article are admissible against him. *Id.* The government responds below to the specific arguments raised in the defense motion.

**A. Hearsay**

Giglio argues that the statements in the article remain hearsay because they are out-of-court statements, and many of the quotes reported involve double hearsay. Dkt. 89 at 4–5 (citing *Larez v. City of L.A.*, 946 F.2d 630 (9th Cir. 1991). However, his hearsay argument only holds water to the extent the article's statements are being offered for the truth of the matters asserted, which they are largely not. As the government has explained, the article's statements are not offered for their truth, but for their effect on Giglio. Dkt. 90 at 15–16. The reporters' implicit assertion that Giglio "said this," *Larez*, 946 F.2d at 642, matters only for the portions of the article offered as Giglio's own admissions. As to those, the second layer of hearsay is satisfied because Giglio adopted the article's account. Fed. R. Evid. 801(d)(2)(B); Dkt. 90 at 16 & n.1. Giglio has "never disputed that he made the statements" reported in the article, *Larez*, 946 F.2d at 644, and has indeed acknowledged and discussed the article in many of his statements to law enforcement and others.

Alternatively, the statements are admissible under the residual hearsay exception. Giglio argues that the article lacks the corroboration present in *Larez*, where "three independent newspapers attributed the same quotations to" the declarant. Dkt. 89 at 5 (quoting *Larez*, 946 F.2d at 643). But Rule 807 now directs the Court to consider "the totality of circumstances under which it was made and evidence, if any, corroborating the statement." Fed. R. Evid. 807(a)(1). Here, the corroboration comes largely from Giglio himself. His recorded statements to law enforcement echo the statements the article attributes to him. For example, the article reported that Giglio "wants to intimidate Trump's antagonists" while "insist[ing] his language falls within the U.S. Constitution's free-speech protections." Dkt. 90 at 2. Three months after the article was published, Giglio told Detective Laverty that he was "trying to do it to make them feel fear or pain but not cross the line or break the law." *Id.* at 10. And after his arrest, he described his method in

nearly identical terms. *Id.* at 11. The evidence of Giglio's communications to others is also replete with his own mentions and references to the article. Finally, the quotations were also published by a major news organization following "a series of interviews" with Giglio (and according to Giglio himself, "thirty hours" of interviews in fact). *Id.* at 2.

Giglio also argues that the article is not "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," because, as in *Larez*, testimony from the reporters "would have been better." Dkt. 89 at 5 (quoting Fed. R. Evid. 807(a)(2); *Larez*, 946 F.2d at 644). Unlike *Larez*, however, where the proponents "had the reporters subpoenaed and apparently ready to testify," and the error was "the failure to take testimony from, and particularly to allow the cross-examination of, the reporters," 946 F.2d at 644, the reporters here will likely be unavailable to testify despite the government's reasonable efforts.[2] Based on the totality of the circumstances, there are "sufficient guarantees of trustworthiness" to admit the article under the residual hearsay exception.

**B. Rule 404(b)**

Giglio's claim that the article was not properly noticed, Dkt. 89 at 6, is incorrect and will be addressed in the government's opposition to Dkt. 85. On the merits, Giglio contends that the article invites a propensity inference, and that an intent to threaten other officials does not show an intent to threaten Congressman Swalwell, citing *United States v. Charley*, 1 F.4th 637, 648 (9th Cir. 2021). Dkt. 89 at 6. But the government does not offer the article to prove that Giglio threatened others and therefore threatened Congressman Swalwell. It offers the article for what it told Giglio, namely that recipients of his messages were frightened by and took them as serious threats, that his communications were treated seriously by law enforcement and others, that some law professors and others believed he had crossed the line, and for what Giglio told the reporters about his own purpose and method. Dkt. 90 at 13–14. Such evidence bears on his awareness of the risk that his communications would be viewed as threatening,

[2] In response to the government's request regarding the availability of the reporters for trial, Reuters has informed the government that it would object to any subpoena or compulsory process for the testimony of its reporters at trial based on its policy. The government has not yet sought compulsory process given that it does not deem the reporters' testimony necessary for the reasons stated above. However, given Reuters' response, the government anticipates that any such effort would be met with an assertion of the reporter's privilege. If this turns out to be the case, the Court should find that the government has made "reasonable efforts" to satisfy Rule 807. If the reporters become available, the government will call them.

*Counterman*, 600 U.S. at 69, and of his plan to intimidate or retaliate against United States officials, which goes to the specific intent required by Counts One and Four. Neither inference depends on Giglio's character. *Charley*, which concerned whether intent to assault one person shows intent to assault another across "dissimilar and unique sets of circumstances," Dkt. 89 at 6, is inapposite. The article describes the same type of communications, directed at the same type of targets, using the same method as the charged calls.

### C. Rule 403

Finally, Giglio objections based on the article's characterizations of his conduct, its discussion of political violence, the views of legal scholars, and its description of other communications, Dkt. 89 at 6–7, can be easily addressed without excluding the article. The government is willing to redact the article's general discussion of political violence and threats against public officials that does not concern Giglio. As for the remainder, the article is not offered for the truth of the reporters' characterizations or the scholars' views, but for their effect on Giglio, who read an article describing his conduct as threatening and debating whether his language "crossed the line," and continued anyway. Dkt. 90 at 15. Nor does the article's political framing render it unfairly prejudicial. Giglio's political animus towards the targets of his communications is itself relevant to his motive and to his intent to retaliate under § 115. *Id.* at 6 (citing *United States v. Chase*, 301 F.3d 1019, 1026 (9th Cir. 2002)). The jury will be instructed on the law by the Court, and a limiting instruction can make clear that the article may not be considered for the truth of the reporters' characterizations or as a statement of the law. And because the article's descriptions of other communications are not offered to prove that Giglio made them, Giglio will not need to "respond to each of those allegations." Dkt. 89 at 7.

## IV. Response to Defense MIL No. 4: The Court Should Exclude or Limit Lay Witness Testimony on Giglio's Stroke and Mental Conditions, and Permit Testimony from the Government's Expert to Address Giglio's Claims

For the same reasons discussed in the government's Second Motion *in Limine*, which the government incorporates by reference here, the Court should exclude evidence and argument regarding Giglio's stroke and other mental conditions. Dkt. 91 at 8–11.

Giglio's Motion *in Limine* No. 2 further confirms the need for that relief, by proffering that Giglio

will testify about "his perception of how his stroke has affected his thought process, physical ability, and emotional responses" and "how his engagement with politics changed after his stroke," and that his friend, Mr. Geffrard, will testify about his observations of Giglio's behavior. Dkt. 89 at 7. Giglio is explicit about the purpose: the testimony is offered to show that, "after his stroke, Mr. Giglio lacks awareness of how he is perceived by others," which he contends bears on whether he consciously disregarded the risk that his communications would be viewed as threatening. *Id.* at 7–8.

That is a mental-condition defense by another name. Giglio's theory is that a neurological injury impaired his capacity to appreciate how his words would be received. This is effectively the same as an insanity claim—i.e., that Giglio was "unable to appreciate the nature and quality" of his threats due to his cognitive injuries—for which Rule 12.2(a) required notice. At the very least, Giglio seeks to offer evidence of a "mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of guilt"—an issue that normally requires "expert evidence"—while circumventing the requirements and intent of Rule 12.2. Fed. R. Crim. P. 12.2(b); *see* Dkt. 91 at 3–4, 8–9.

It does not matter that the witnesses will not "claim that Mr. Giglio is not guilty by reason of insanity or that his stroke rendered him incapable of forming criminal intent." Dkt. 89 at 8. Of course they will not and should not be allowed to so do as that would be entirely impermissible testimony on an ultimate question for the jury. What matters is the fact that their testimony will unfairly invite the jury to make these very inferences, without providing or allowing for the necessary scientific and medical information for the jury to adequately evaluate these lay opinions. Thus, Giglio's argument that Rule 12.2(d)(1)'s exclusion remedy by its terms refers only to "expert evidence," Dkt. 89 at 8, misses the broader point. The critical question is whether Giglio may obtain the benefit of a mental-condition defense, by inviting the jury to infer that a stroke impaired his mental state, while avoiding the notice, examination, and rebuttal procedures of Rule 12.2, which are aimed at minimizing the danger of unfair prejudice when such evidence is introduced without following the rule's requirements. *See United States v. Winn*, 577 F.2d 86, 89 (9th Cir. 1978) (Rule 12.2 "is designed to insure that both the defendant and the Government have ample opportunity to investigate the facts of an issue critical to the determination of guilt or innocence").

Indeed, the proposed testimony exceeds the bounds of Rule 701 and 403. While a lay witness may describe what he observed, he may not offer an opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Whether a 2016 left pontine stroke, or other cognitive injuries or mental conditions caused changes in Giglio's thinking, his emotional responses, or his awareness of how others perceive him, is a medical opinion. Dkt. 91 at 9. Giglio's "perception of how his stroke has affected his thought process," Dkt. 89 at 7, is not a perception at all; it is a causal attribution that neither he nor Mr. Geffrard is qualified to make. And without expert evidence of a link between the stroke and Giglio's capacity to form the requisite mental state, the testimony has no legitimate probative value on that question. *See United States v. Christian*, 749 F.3d 806, 815 (9th Cir. 2014); Dkt. 91 at 9–10.[3]

The proffered testimony would also mislead the jury in violation of Rule 403. As Dr. Choi's preliminary report explains, a left pontine stroke of the kind reflected in Giglio's records ordinarily results in motor impairment, not cognitive impairment, and much more medical information is required to reach an opinion on whether and how Giglio's cognitive injuries affected his ability to appreciate the nature of his threatening communications. Dkt. 91 at 4–5. Unfortunately, because Giglio never filed his Rule 12.2 notice, he has prevented the government from investigating and seeking out the medical information required to assist the jury in evaluating these complicated claims. Presenting only lay testimony to invite the jury to speculate on these matters, without any medical foundation, would confuse the issues and mislead the jury. Fed. R. Evid. 403. Moreover, to the extent Mr. Geffrard would testify to Giglio's own out-of-court statements about his communications with politicians, Dkt. 89 at 7, those statements are inadmissible hearsay when offered by the defendant. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir.

[3] Giglio's reliance on *United States v. Broderick* does not help him. While the district court permitted a therapist to testify "as a lay witness as to his observations of [the defendant]'s behavior using language which is commonly understood as lay nomenclature, such as paranoid and delusional," it otherwise excluded "observations, diagnoses, or medical conclusions," "the use of language 'which would suggest a diagnosis,'" and anything that "would risk "would risk lending an air of expertise to his lay testimony." *Broderick*, No. 24-5919, 2026 WL 1182177, at *2 (9th Cir. Apr. 30, 2026) (unpublished). *Broderick* thus supports limiting lay testimony to observed behavior that can be described in lay terms without venturing into expert evidence territory, such as a lay witness's attribution of certain behavior to a medical cause. Thus, while Giglio's lay witnesses may describe in lay terms observed changes in Giglio's behavior after 2016 (to the extent that is relevant), any mention of Giglio's stroke, brain damage, or other cognitive injuries would still go too far by suggesting a medical cause or excuse for Giglio's criminal conduct.

2000); Dkt. 91 at 10.

If the Court is inclined to permit lay testimony on the subject of Giglio's stroke, the government requests the alternative relief set forth in its Second Motion *in Limine*: (1) a proffer outside the presence of the jury before any reference to Giglio's stroke or mental condition; and (2) the opportunity to call Dr. Choi. Dkt. 91 at 11. If Giglio is permitted to invite the jury to infer that a stroke impaired his mental state, fairness requires that the jury also hear the medical evidence bearing on whether that inference has any basis. *Id.*

**V. Response to Defense MIL No. 5: The Court Should Only Allow Argument on the "Speech Integral to Conduct" Exception If It Requires the Jury to Make a Factual Finding on that Point**

At this stage, the government does not intend to make an argument at trial pertaining to the "speech integral to conduct exception." Whether a charged offense falls under the "speech integral to conduct" exception of the First Amendment is normally a question of law that is generally reserved for the Court, not the jury. Indeed, Giglio's arguments (based on *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), and Judge Watford's concurrence in *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014)) go to the merits of the as-applied First Amendment question, which is an issue of law that the parties have already briefed, *see* Dkts. 38, 39, and the Court has already resolved, and therefore not a matter for argument before the jury.

As explained in the government's opposition to Giglio's Motion to Dismiss, the "speech integral to conduct" exception is one theory that renders the offense charged in Count Three constitutional under the First Amendment, both facially and as-applied to this case. Another theory of constitutionality would be a "true threats" theory. However, unlike a "true threats" theory of constitutionality, the "speech integral to conduct" exception does not typically require a jury to make findings of fact to establish whether the exception is met. Rather, once a court finds that the exception is met by the charged offense as a matter of law, the jury need only make the findings of fact necessary on the elements of the charged offense at trial.

Here, the offense charged in Count Three, 47 U.S.C. § 223(a)(1)(C), is constitutional because it constitutes "speech integral to conduct" under the First Amendment as a matter of law. *See United States v. Waggy*, 936 F.3d 1014, 1019–20 (9th Cir. 2019) (upholding a materially similar telephone harassment

statute because it "regulates nonexpressive conduct"); *see also* Dkt. 38 at 18–21. Thus, there is no need for the jury to make any findings of fact (other than on the elements of the offense) to further establish that the First Amendment exception is met. Rather, the jury should be instructed only on the elements of the offense charged in Count Three. If it finds the government has proven those elements beyond a reasonable doubt, there are no further jury findings required for Count Three to survive the First Amendment. For this reason, it is also unnecessary for any party to argue to the jury whether or not the conduct falls under the "speech integral to conduct" exception.

As a contrast to Count Three, the jury will be required to find a "true threat" for the offenses charged in Counts One, Two, and Four. The reason why the "true threat" question is treated differently at trial than the "speech integral to conduct" question (or most other legal questions of constitutionality) is that (1) the "true threat" question is a traditionally fact-based one reserved for the jury, and (2) a "true threat" finding is required to render the threat charges in Counts One, Two, and Four constitutional under the First Amendment—unlike Count Three, which is constitutional as "speech integral to conduct," whether or not a true threat is found.

For the reasons above, the government has requested the jury receive a "true threat" instruction that applies only to Counts One, Two, and Four, and not any instruction on "speech integral to conduct." If the Court agrees that no "speech integral to criminal conduct" instruction is required, there is nothing for either party to argue to the jury on that point, and the government will not explicitly invoke the "speech integral to conduct" exception. This, however, does not preclude the government from otherwise arguing that Giglio acted "with intent to abuse, threaten, or harass any specific person." 47 U.S.C. § 223(a)(1)(C), which is a required element that the government is entitled to argue that it has proven, regardless of whether the jury also finds that the communication was a true threat.

Should the Court require a "speech integral to conduct" instruction and findings on that exception by the jury, however, the government respectfully requests that the Court allow both parties to make the arguments necessary to address the matter.

//

//

**VI. Response to Defense MIL No. 6: The Court Should Permit Witness Testimony on "Listener Reaction," Including Emotional Impact, Because It Is Directly Relevant to the Charged Threats**

Giglio moves to preclude testimony regarding the "ongoing emotional impact" of Giglio's communications, arguing that "only Mr. Giglio's subjective intent is at issue" and that the impact on the witnesses is therefore irrelevant. Dkt. 89 at 10. The premise is wrong. The government must prove both an objective threat and the requisite subjective mental state for the threat counts at trial. *See United States v. Anten*, 184 F.4th 1115, 1123–24 (9th Cir. 2026). Whether a statement is objectively a true threat "must be determined in light of the entire factual context of the defendant's statements," which includes "the surrounding events, the reaction of the listeners, and whether the words are expressly conditional." *United States v. Hanna*, 293 F.3d 1080, 1087–88 (9th Cir. 2002) (quoting *United States v. Mitchell*, 812 F.2d 1250, 1255 (9th Cir. 1987)). *Anten*'s holding that the objective element must be "judged through the eyes of a reasonable person" rather than from the victim's perspective, 184 F.4th at 1123, does not retreat from that principle, but applies it. *See id.* at 1124 (approving an instruction directing the jury to consider "the circumstances under which the electronic communication was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who received the electronic communication."). Indeed, as Giglio acknowledges, "the listener's reaction to the threat may still be relevant insofar as it illustrates what a reasonable person would do." Dkt. 89 at 1 (citing *Anten*, 184 F.4th at 1123–24).

The recipients' reactions to Giglio's communications—emotional or otherwise—are thus part of the evidence from which the jury determines how a reasonable person would understand the communication. *See also Mitchell*, 812 F.2d at 1255 (noting that "[t]he agents who heard the statements apparently took them quite seriously"). As such, the recipients of Giglio's calls should be permitted to testify about how they reacted when they heard Giglio's words and what they did in response, which is highly probative evidence that goes directly to the objective element of a true threat. Furthermore, Giglio's concern about potential prejudice from evidence of "ongoing" emotional impact is unfounded. Unlike the Fourth Cicuit case on which Giglio relies, *see* Dkt. 89 at 10, the government has no intent here to elicit testimony about "long-term effects" on the witnesses' lives. As such, the probative value of the testimony

it will elicit on the recipient's reactions to Giglio's communications substantially outweighs any danger of unfair prejudice.

### VII. Response to Defense MIL No. 7: The Court Should Exclude USCP's Law Enforcement Opinions on Whether Giglio Made a "True Threat"

As already addressed in the government's Third Motion *in Limine* (Dkt. 92), which is hereby incorporated by reference, the Court should exclude the law enforcement opinion conveyed in the April 1, 2025 email from USCP Special Agent Walter Ramirez to a member of Congressman Swalwell's staff that "[t]he content of these calls do not meet the threshold to be considered a true threat, but are concerning, none the less." As explained in the government's Third Motion *in Limine*, such an opinion is inadmissible under *Hanna* and Rules of Evidence 401, 403, and 801.

As to the other contents of the USCP email, the government does not object to the extent that they would be relevant and otherwise admissible at trial under the rules of evidence. Giglio's motion, however, has not necessarily established their admissibility.

In terms of the relevance, the information conveyed in the USCP email regarding Giglio (that he lived in Florida, was physically impaired, etc.) has no bearing on the recipient's reaction to the March 27 voicemails when these facts were communicated many days after and unknown to the recipients at the time the threatening communication was made. Put another way, whatever Congressman Swalwell's staff later learned about where Giglio lived or his physical condition could not have informed how a reasonable person would have understood the voicemails at the time they were received, and it does not make the recipients' reactions at that time any less reasonable. While the email may be slightly more relevant to Count Four, there is little indication that the contents of the email were ever conveyed or known to the intern who directly answered and listened to the June 13 call. Furthermore, the information in the April 1 email was out of date by June 13, as Giglio informed FBI Special Agent Nicholas Schnelle on or about June 3, 2025 that he had relocated from Florida back to California. Dkt. 90 at 5. Whether or not the office's staff was aware of the fact that Giglio was in California, they were nonetheless alarmed—based on his June 13 statements ("we are coming" and "[w]e are going to hurt everyone")—that he might come to the office or to a public-facing event and attack them.

More fundamentally, the facts that Giglio highlights—where Giglio lived, whether he had a vehicle, and his physical condition—go only to his capacity to carry out a threat, which is legally irrelevant. *Virginia v. Black*, 538 U.S. 343, 359–60 (2003) ("The speaker need not actually intend to carry out the threat."); *Mitchell*, 812 F.2d at 1255–56 (rejecting a defendant's argument "that he was incapable of carrying out the threats" because "the threat itself is the crime," and "[w]e have therefore upheld the section 871 conviction of a defendant who had no apparent capacity to carry out the threat" (citing *United States v. Merrill*, 746 F.2d 458, 462 (9th Cir. 1984)); *United States v. Melendy*, 438 F.2d 531, 532 (9th Cir. 1971) (incarcerated defendant "did not have much capacity to carry out his threat, but the threat is the crime"). A statement that "we are coming" and "are going to hurt everyone" does not become less threatening because the speaker may be far away; by its own terms, Giglio's threatening communication contemplates others acting with him.

Additionally, the April 1 email is hearsay given that Giglio offers it for the truth of the matters it asserts—where Giglio lived, what vehicle he had, how far he could walk, and USCP's assessment of his calls—based on secondhand reports of earlier police contacts, and makes no attempt to show any exception that applies. *See* Dkt. 92 at 6. Admitting it would also invite the very danger *Hanna* identified: the risk that the jury would defer to a law enforcement agency's assessment rather than its own. 293 F.3d at 1086-87. Unless Giglio can establish admissibility, the Court should deny this motion.

**VIII. Response to Defense MIL No. 8: The Court Should Admit Evidence of the USCP "Facesheet" Because It is Directly Relevant to the Charged Offenses**

The Court should deny Giglio's motion to exclude the "facesheet" of Giglio that was posted in Congressman Swalwell's office because the evidence is directly relevant to the government's proof of the objective element of a true threat, and its probative value substantially outweighs any danger of unfair prejudice.

The facesheet is directly relevant and highly probative as evidence of the response of the recipients to Giglio's voicemails in March 2025, rather than any law enforcement assessment of Giglio. The government will offer the facesheet at trial through the testimony of Desiree Broome, the District Director for Congressman Swalwell's office at the time of the offenses, who will testify that she received the

facesheet from the office's law enforcement coordinator (Joseph Pientka) and then had it posted in areas around the office as part of their security response to Giglio's calls. Ms. Broome will also testify about the posting of the facesheet in the context of other security measures the office implemented in response to Giglio's calls. Ms. Broome will not testify about the April 1 email in which USCP Special Agent Ramirez transmitted the facesheet to Joseph Pientka, as Ms. Broome was not part of that communication and it is otherwise irrelevant at trial.

As already discussed, the recipients' reactions are part of "the entire factual context" the jury must consider. *Hanna*, 293 F.3d at 1087–88; *Anten*, 184 F.4th at 1124. The office's decision to post Giglio's facesheet as a security measure in response to his calls is concrete, contemporaneous evidence of how seriously the office took his March 2025 voicemails. It is also evidence of the security posture in place when Giglio called again on June 13, and of why the office feared he might appear in person. Indeed, Giglio does not dispute that "a witness's receipt of safety instructions" may be relevant, Dkt. 89 at 13, but argues only that the government should be limited to "narrowly tailored testimony." *Id.* To that extent, the government's offer of the facesheet through only the testimony of Ms. Broome in the context of the office's security response is sufficiently "narrowly tailored" and highly probative.

Furthermore, Giglio fails to make clear what prejudice—let alone unfair prejudice—is caused by admission of the facesheet. The facesheet itself contains no opinion about whether Giglio's communications were threats or crimes; it only identifies Giglio by his photograph and tells staff what to do if he appears or contacts them again. The photograph itself is not prejudicial, particularly when Giglio will be appearing in person at his own trial. Furthermore, the photograph is part of what made the facesheet meaningful to the staff: it allowed them to recognize Giglio if he appeared. If there are concerns regarding the personally identifying information contained in the facesheet, the government does not object to those specific redactions from the exhibit.

In any event, the government does not offer the facesheet for the truth of anything it asserts, or to suggest that USCP "independently determined that Mr. Giglio was dangerous," particularly when it will not be introduced with any testimony regarding USCP's determinations at all. Rather, the facesheet will be offered through the testimony of Ms. Broome, a staff member recipient of Giglio's threat, who posted

it in the office as a security measure in response to the threat. While *Hanna* bars law enforcement opinions on the ultimate question, 293 F.3d at 1086–87, it does not bar evidence of what the recipients of a threat did in response. *See* Dkt. 92 at 7 (the recipients "may testify about their own reactions and what they did in response, including reporting the calls to law enforcement"). Thus, Giglio's concern that the jury will treat the facesheet as any sort of law enforcement "endorsement of the government's theory" is generally unfounded, and if necessary, can be addressed with a limiting instruction that the facesheet should be considered only as evidence of the office's response, and not as evidence of any law enforcement assessment of Giglio or his communications.

As the Court reaffirmed in *Old Chief*, "the prosecution is entitled to prove its case by evidence of its own choice," because evidence "has force beyond any linear scheme of reasoning." 519 U.S. at 186-87. While an alternative that has "substantially the same or greater probative value but a lower danger of unfair prejudice" may be preferred, *id.* at 183, that does not apply here. Mere testimony that the office "received safety instructions" does not have the same probative value as the actual document that the office posted as a security measure taken in response to Giglio's communications. To the extent the Court has concerns about particular identifying details, the government would not object to redacting information not necessary to show the office's response. However, the facesheet itself, including the photograph and other relevant information contained, should be admitted.

## IX. Response to Defense MIL No. 9: The Court Can Deny the Motion as Moot Because the Government Does Not Intend to Introduce Giglio's Prior Convictions and Arrests

The government will not affirmatively introduce evidence of Giglio's prior convictions and arrests in its case-in-chief. Therefore, the Court may deny this motion *in limine* as moot.

However, should Giglio open the door to this evidence, such as through Giglio's testimony, character testimony from Mr. Geffrard, or otherwise, the government reserves the right to seek admission of relevant evidence for impeachment or rebuttal purposes and will first raise the matter with the Court outside the presence of the jury. *See* Fed. R. Evid. 405(a) (on cross-examination of a character witness, "the court may allow an inquiry into relevant specific instances of the person's conduct").

//

**X. Response to Defense MIL No. 10: The Court Should Require Clarification from Defense Before Ruling on this Motion to Exclude "Guilt-Assuming Hypotheticals"**

Giglio moves to preclude "guilt-assuming" questions and hypotheticals on cross-examination of defense witnesses. Dkt. 89 at 15. The government does not intend to ask character witnesses hypothetical questions that assume Giglio's guilt of the charged offenses, as the Ninth Circuit found improper in *United States v. Shwayder*, 312 F.3d 1109, 1120–21 (9th Cir. 2002). It is worth noting that *Shwayder* addressed only character witnesses, and Giglio's motion is not so limited, as it reaches "defense witnesses" generally. Dkt. 89 at 15. *Shwayder* itself recognized that, on cross-examination of a character witness, inquiry into relevant specific instances of conduct remains permissible. 312 F.3d at 1120; *see* Fed. R. Evid. 405(a). And nothing in *Shwayder* restricts hypothetical questions grounded in the trial evidence when cross-examining an expert witness, such as Giglio's noticed expert, *see* Fed. R. Evid. 705, or questions testing the factual premises of a fact witness's testimony. The government therefore requests that Giglio clarify which witnesses and what categories of questions the motion is intended to reach, and that the Court defer ruling on any application beyond character witnesses until a specific question arises at trial.

**XI. Response to Defense MIL No. 11: The Court Need Not Exclude References to the Terms "threats," "threatening," and "victim"**

The Court should deny Giglio's motion to bar the parties and witnesses from using the words "threats," "threatening," and "victim." Dkt. 89 at 15–16. As to "threats" and "threatening," the request is unworkable. This is a threats case, in which the charges, the Court's instructions, and the parties' arguments, in turn, will necessarily use these words. The statutes charged in Counts One, Two, and Four make it a crime to "threaten[]" a federal official, and to transmit "any threat to injure the person of another," 18 U.S.C. § 875(c), and Count Three requires proof of an intent to "abuse, threaten, or harass," 47 U.S.C. § 223(a)(1)(C). The Court's instructions will necessarily employ these words, *see Anten*, 184 F.4th at 1121, 1124 (discussing instructions tracking Ninth Circuit Model Criminal Jury Instruction 8.13). Furthermore, the words "threats" and "threatening" are terms that are commonly used and understood, and is necessarily part of the evidence and anticipated evidence at trial. Neither the parties nor the witnesses can fairly describe the charged conduct, the evidence, or the law without use of these words.

Giglio also cites no Ninth Circuit authority for its request, except for an out-of-circuit district court decision pertaining to the word "victim." Dkt. 89 at 16 (citing *United States v. August*, 590 F. Supp. 3d 972 (W.D. Tex. 2022)).

The concern underlying the motion—that a witness might improperly offer an opinion that Giglio's communications were threats—is already addressed by the government's Third Motion *in Limine*, which asks the Court to bar any witness from opining that the communications were or were not "true threats" or "criminal." Dkt. 92 at 6–7. The government will not elicit such opinions. However, witnesses should not be required to contort their testimony to avoid ordinary words. A recipient who testifies that she felt threatened, or that she perceived a call as threatening, is describing her own reaction, which is relevant for the reasons discussed above, not offering a legal conclusion. Nor should counsel be barred from arguing, based on the evidence, that the communications were threats. That is the government's theory of the case, and the jury will be instructed that the lawyers' statements and arguments are not evidence and that it must apply the law as instructed by the Court, including the definition of a true threat.

As for "victim," the government does not intend to refer to Congressman Swalwell or his staff as "victims" when questioning witnesses, and will instead refer to them by name or role. A blanket order is nonetheless unnecessary, and any danger of unfair prejudice resulting from an isolated use of the term can be addressed by the jury's instructions.

## XII. Response to Defense MIL No. 12: The Court Should Not Order Redaction of Giglio's Communications

The Court should deny Giglio's request to order the redaction of slurs, "including the N-word and F-word," from "any written exhibits, audio recordings," and witness testimony. Dkt. 89 at 16. Again, this is a threats case. The exact words used by Giglio in his communications matter, as they are directly relevant to the elements of the charged offenses. Redactions would risk confusing the jury while denying its ability to assess the full context of the communications as they were received by the recipients.

At a minimum, the request should be denied with respect to the charged communications. The homophobic word that Giglio seeks to redact appears throughout both March 27 voicemails and is woven into the threatening statements themselves. Redacting the word would alter the very statements the jury

must evaluate and would present the jury with a sanitized version of communications that the recipients heard unredacted. The objective inquiry asks how a reasonable person would understand a statement "in the entire context and under all the circumstances," *Planned Parenthood*, 290 F.3d at 1077, and the tone, hostility, and personal animus conveyed by Giglio's language are part of that context. The language is also probative of Giglio's intent to intimidate and retaliate against Congressman Swalwell under Counts One and Four and of his intent to "abuse, threaten, or harass" under Count Three.

With regard to the "N-word," the government does not object to a limited redaction of the word except for its first letter ("n"), so that the jury is still provided sufficient and necessary context for the language Giglio used without being exposed to the potentially prejudicial effect of the racial slur. The term does not appear in either of the charged communications, though it does appear in at least one of Giglio's own messages from his phone. *See* Dkt. 90-1 at 1 (entry 5). To effectuate the agreed-upon redactions, the government requests that the Court address proposed redactions on an exhibit-by-exhibit basis, rather than through a blanket order.

Any other redactions would be inappropriate here, and Rule 403 does not counsel otherwise. Rule 403 guards against unfair prejudice, meaning "an undue tendency to suggest decision on an improper basis," Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules, not against evidence that is damaging because it is probative. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *Hankey*, 203 F.3d at 1172 (citation omitted). The offensiveness of Giglio's language cannot be separated from its probative force; it is what Giglio chose to say to a Member of Congress's office, and part of what made his words alarming to those who heard them. Giglio's reliance on *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004), a hostile work environment case recognizing the offensiveness of a racial slur, underscores the point: the offensiveness of the language is evidence of hostility, not a reason to conceal it. Any risk that jurors will decide the case based on disapproval of Giglio's language, rather than on the elements, can be addressed through *voir dire* and a limiting instruction.

//

**XIII. Response to Defense MIL No. 13: The Government Does Not Object to a Reading of a Statement Summarizing the Charges in Lieu of Providing the Information to the Jury**

The government does not object to the Court reading the jury a brief, neutral statement summarizing the charges in lieu of reading or providing the Information to the jury. The parties have submitted a jointly proposed statement of the case for this purpose. *See* Dkt. 104.

**XIV. Response to Defense MIL No. 14: The Court Should Require Defense to Subpoena its Own Witnesses**

Giglio asks the Court to order that any government witness released by the government be deemed under defense subpoena for the duration of trial, Dkt. 89 at 17, but identifies no authority for such an order. Instead, the only authorities Giglio cites confirm that an indigent defendant may obtain compulsory process for his own witnesses under Rule 17(b): "Upon a defendant's ex parte application, the court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense." Fed. R. Crim. P. 17(b). Nothing prevents Giglio from using that procedure now for any government witness it intends to call.

A blanket order deeming every government witness to be under defense subpoena would impose open-ended obligations on witnesses, many of whom have full-time jobs and other obligations and/or are traveling from out of state, and who have not been served by Giglio and may never be called. To address Giglio's concern, the government will notify defense counsel before releasing any witness from its subpoena at least 24 hours in advance, where practicable, so that he may serve any witness he wishes to call.

**XV. Response to Defense MIL No. 15: The Court Should Issue a Sequestration Order Consistent with Rule 615(a), Which Permits the Government's Designated Case Agent**

When Rule 615 is invoked, witnesses are generally excluded from trial, except when testifying, so that they cannot hear other witnesses' testimony. *See* Fed. R. Evid. 615. However, Rule 615(a) notes several exceptions to this general rule, and government case agents are generally permitted to remain present for trial. *See United States v. Valencia-Riascos*, 696 F.3d 938, 941-42 (9th Cir. 2012) (citing *United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) ("[T]he district court did not abuse its

discretion in allowing the case agent to remain at the prosecutor's table. The case agent was exempt from sequestration.") (citation omitted)); *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987)).

The government does not object to an order under Rule 615(a) excluding all non-exempt witnesses from the courtroom during testimony, or to an order under Rule 615(b) prohibiting the disclosure of trial testimony to excluded witnesses and prohibiting excluded witnesses from accessing trial testimony, provided the order applies equally to both parties. Pursuant to this order however, the Court should exempt the following witnesses from exclusion: (1) FBI Special Agent Tiffany Speirs, as the government's designated agent pursuant to Rule 615(a)(2); (2) FBI Special Agent Daniel Dales, whose presence is essential to the presentation of the government case pursuant to Rule 615(a)(3), as he was the original case agent who opened and investigated the FBI case that led to the charges in this case; and (3) Dr. Octavio Choi, whose presence is essential for the government's case under Rule 615(a)(3), particularly during any testimony relating to Giglio's stroke or other medical or mental conditions and their impact on his conduct, as he may be called upon to provide expert testimony in response.

With regard to its designated case agent, the government objects to Giglio's request that she be required to testify first. Rule 615(a)(2) exempts from exclusion "one officer or employee of a party that is not a natural person if that officer or employee has been designated as the party's representative by its attorney." Giglio concedes that a federal case agent qualifies, Dkt. 89 at 19, and the Ninth Circuit has declined to adopt the rule Giglio proposes. *Valencia-Riascos*, 696 F.3d at 938, 938 n.4 (9th Cir. 2012) (although "it may be a good practice to require case agent witnesses to testify first," this is not "a strict rule"); *see also United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) (no abuse of discretion in permitting case agent to remain at the prosecution table). The order of the government's witnesses should be left to the government.

**XVI. Response to Defense MIL No. 16: The Court Should Not Designate the Defense Investigator as a "Case Agent," But May Permit Her to Hear Testimony After She Testifies**

Giglio asks the Court to designate its investigator, Khouloud Ballout, as a "case agent" exempt from exclusion. Dkt. 89 at 20–21. Rule 615(a)(2)'s exemption for a designated representative applies only to "a party that is not a natural person." Giglio, who is himself entitled to be present throughout trial,

Fed. R. Evid. 615(a)(1), has no corresponding entitlement to designate an additional representative. Giglio must instead show that Ms. Ballout's presence is "essential to presenting the party's claim or defense." Fed. R. Evid. 615(a)(3). Here, Giglio has not met that burden. This is a straightforward trial arising from two phone calls, with a limited number of witnesses, expected to last four to five days. It is not the kind of complex case that might warrant such an exemption. *Cf.* Dkt. 89 at 20 (citing *United States v. Ortiz*, 10 F. Supp. 2d 1058, 1067 (N.D. Iowa 1998), as permitting a defense investigator to remain in the courtroom in a "complicated trial").

Moreover, Giglio anticipates that Ms. Ballout may testify about "the results of investigations, including investigations prompted by testimony of other witnesses." Dkt. 89 at 20. That is precisely the circumstance in which the risk of tailoring is greatest, and the reason Rule 615 exists. *See id.* at 18 (citing *Geders v. United States*, 425 U.S. 80, 87 (1976)). Indeed, Giglio argues that witnesses should remain excluded even after they testify, because a witness who has already testified "may wish to tailor rebuttal testimony." *Id.* (quoting *United States v. Ell*, 718 F.2d 291, 293 (9th Cir. 1983)). The government does not object, however, to Ms. Ballout remaining in the courtroom after she has completed her testimony and has been excused from further testimony, or to her assisting counsel in a manner consistent with any order under Rule 615(b).

**XVII. Response to Defense MIL No. 17: The Court Should Defer Ruling on This Motion as It Is Currently Inapplicable**

The government has provided all discovery in its possession to Giglio in compliance with the agreed-upon deadline, and is not aware at this time of any additional discovery forthcoming. However, the government's discovery obligations are continuing. Rule 16(c) requires a party who discovers additional evidence or material before or during trial to "promptly disclose its existence to the other party," and the government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500, likewise continue through trial. Accordingly, additional material may come to light as trial preparation continues, such as, new statements by witnesses during trial preparation, or rebuttal material responsive to the defense case. A blanket order excluding all evidence produced after November 3, 2026, regardless of its nature, the reason for its timing, or any

prejudice to Giglio, would be inconsistent with Rule 16(d)(2), which leaves the remedy for any discovery violation to the Court's discretion and lists exclusion as only one of several options. Fed. R. Crim. P. 16(d)(2)(A)–(D). Any order should also apply equally to Giglio's reciprocal discovery obligations under Rule 16(b). Because no late production is presently at issue, the Court should defer ruling unless and until a specific issue arises, at which point it can evaluate the circumstances and fashion an appropriate remedy.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny or rule on Giglio's Motions *in Limine* as discussed above.

DATED: November 10, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
ANNE C. HSIEH
AMANI S. FLOYD
Assistant United States Attorneys